## Kentucky Electric Development Company's Receiver et al. v. Head.

(Decided Feb. 6, 1934.)

SQUIRE R. OGDEN, J. BLAKEY HELM and GORDON, LAURENT & OGDEN for appellants.

D. A. McCANDLESS and LEE JONES for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON—Affirming.

Minnie W. Head brought this action in the Jefferson circuit court to rescind contracts of purchase of stock in the Utilities Investment Corporation on the ground of fraud and misrepresentation. About July 7, 1931, she was the owner of 61 certificates of preferred stock in the Louisville Gas & Electric Company of the city of Louisville of the market value of $116 per share, or a total of $7,070. It was paying, and had been paying for many years, a dividend of 7 per cent. It was listed on the Louisville Stock Exchange at $116 per share of $100, and this was the current daily market price. It was the custom of the Louisville Gas & Electric Company, for the convenience of its stockholders and patrons, to maintain a sales agency in the same building in which its general offices were located, where it would sell or exchange their stock at market value on any business day. Its stock was very desirable and in demand. On the 7th of July, Mrs. Head resided in the city of Louisville, Ky., and, while visiting at the home of Mrs. Mary E. Dixon, in the city, Hedley R. Rowe, a sales agent of the Utilities Investment Corporation, accompanied by a young lady employee, was at the home of Mrs. Dixon for the purpose of inducing her to purchase stock of the Utilities Investment Corporation. At that time Mrs. Head was 70 years of age, making her home wherever she was able to engage a comfortable one, living among strangers and without relatives. For ten years she had been afflicted with high blood pressure, hardening of the arteries, and "heart trouble." She was not acquainted with Rowe nor with any official of the corporation. She had no knowledge or information concerning the corporation nor of its financial condition. While he was endeavoring to sell Mrs. Dixon some of the common stock of the corporation Mrs. Head, to use Rowe's language, "seemed interested." He immediately made an appointment to see her shortly after the conversation with Mrs. Dixon. She left the home of Mrs. Dixon with Rowe; they went together to her

home, where he remained extolling the qualities and value of the stock of his corporations for a period of about forty-five minutes. He made an appointment with Mrs. Head to meet her the next day at noon at the office of the company, and, to make certain she came, another employee, in an automobile, went after and brought her to the office, where he closed the deal with her by which he exchanged 3 shares of Kentucky Electric Development, preferred, for her 3 shares of building and loan stock. The Kentucky Electric Development Company was affiliated with the Utilities Investment Corporation and the Public Utilities Development Company, the three occupying the same office and were managed by the same officials. Within three or four days after he had induced her to exchange her stock in the building and loan association for 3 shares of the Kentucky Electric Development Company, preferred, he again sought Mrs. Head for another deal. He was accompanied on the latter occasion by Wildenburg, another employee or official of one or more or all three of the corporations. At the time Rowe was at the home of Mrs. Dixon in the presence of Mrs. Head, he represented to them that, if they purchased stock in his corporations, they could get their money back ''just like from the Louisville Gas and Electric Company''; ''they were going to pay 6% interest and the Louisville Gas and Electric Company was just going to pay 5% after a little while.'' After he and Mrs. Head reached her home, he said to her that the Louisville Gas & Electric Company ''was not any better than his company—no company was any better than his.'' His company ''would promptly pay interest four times a year,'' whereas ''she had only gotten last year her dividend one time.'' He represented to her that the Louisville Gas & Electric Company within less than two weeks would quit paying 7 per cent. and pay only 5 per cent. or less. He advised and urged her to take her money out of the Louisville Gas & Electric Company and put it into one of his corporations where she ''would get 6% regularly, all the time and get it promptly and would not have to wait a day.'' Mrs. Head testified ''he talked so much and so fast'' she was unable to repeat all of his statements. Rowe claims that at the time he and Wildenburg were at the home of Mrs. Head she ''did not evince any particular concern as to when she could get her money out.'' Later she did. Two days after he and Wildenburg were at

her home, she was again conveyed to the office of the corporations. The agents beleaguered her until they induced her to deliver to their corporations her stock in the Louisville Gas & Electric Company and to accept in exchange therefor 37 shares of preferred stock of the par value of $100 each, in one of their corporations, and a certificate for 34 shares of like value in the same corporation, and surrender to it her stock in the Louisville Gas & Electric Company. As a form they caused her to sign and deliver a request order for the stock. Before the actual delivery of her stock in the Louisville Gas & Electric Company was completed she claims she found out she could not get her money back as represented to her by Rowe and Wildenburg, and for this reason she refused to go on with the deal. Therefore Wildenburg went to see her, and, as she claims, "talked and talked, stood over her and waved his hands over her head," and "confused" her until she signed the paper consenting to the transfer of her stock in the Louisville Gas & Electric Company. We are not favored with Wildenburg's testimony.

William T. Boden, a certified accountant, audited the books of the three corporations and reported the same for the years 1930 and 1931. The report for 1930 bears date April 17, 1931. It embraces these statements:

> "We feel that we should be derelict in our responsibilies and duties to the Boards of Directors in the Oscar C. Wright Company and the Kentucky Electric Development Company did we not call their attention in an emphatic manner to the danger involved in the declaration and payment of dividends in excess of earnings and out of capital. * * * It applies to future declarations. * * * We must, therefore, suggest and earnestly advise you to pass all dividends and refrain from the declaration of them until earnings will have absorbed present deficits and large proportions of capitalized expenses, which from a sound and conservative standpoint should be charged off as quickly as it is possible to do so."

During the year 1930, dividends were declared and paid, partly out of earnings and partly out of capital. The profits were $6,300 and the dividends $16,000.

> "As of that time, the book value, with that charged off—$284.00, minus $55,000.00, of which the Com-

mon Stock would have absorbed $43,000.00, leaving $12,000.00 to be charged off, which would make the Preferred Stock less than par, something around 95c.''

The Kentucky Electric Development Company, along with the other corporations, was in the hands of a receiver at the time of the trial of this action.

The application of Mrs. Head for stock was taken on the application form of the Public Utilites Development Company. The Utilities Investment Corporation was an agent of the Kentucky Electric Development Company to sell its stock, and Rowe and Wildenburg were the sales agents. The stock of the Kentucky Electric Development Company had no par value. By the books of the Utilities Investment Corporation its par value was approximately $1.75 per share. Mrs. Head strenuously insists the proven facts sustain her charge of fraud and misrepresentation. The Kentucky Electric Development Company, the Utilites Investment Corporation, and the Public Utilities Development Company, by and through the receiver, with like earnestness and vigor contend the contrary. The trial court decreed Mrs. Head was entitled to have the contracts of purchase rescinded and her stock in the Louisville Gas & Electric Company returned to her. In open court the corporations declared their intention not to return the stock. Thereupon judgment was entered for the market value of her stock, less the small dividend paid to her.

The general rule is that an action can be maintained on the ground of fraud, deceit, or misrepresentation when it is alleged and proven the defendant made a material representation; it was false when he made it; he knew it was false or made it recklessly without any knowledge of its truth, as a positive assertion; it was made with the intention of inducing the plaintiff to act or that it should be acted upon by him; and that he acted in reliance upon it, and thereby suffered injury. Crescent Gro. v. Vick, 194 Ky. 727, 240 S. W. 388; Dennis v. Thomson et al., 240 Ky. 727, 43 S. W. (2d) 18, 23; Addison et ux. v. Wilson et al., 238 Ky. 143, 37 S. W. (2d) 7.

Where fraud has been committed in the obtaining of a contract, it may be taken advantage of in two forms: (1) By an affirmance of the contract and a recovery of damages for the injury; (2) by a disaffirm-

ance of the contract and a recovery of the thing parted with as the consideration. By the latter, the contract is treated as a nullity. This mode can only be adopted upon certain terms; those terms are: That he surrender or tender a surrender within a reasonable time to the other contracting party the thing which he has received under the disaffirmed contract. He is not permitted to hold onto the thing which he has received and successfully effect a restoration of the thing which he has parted with under the contract. Ball v. Lively, 4 Dana, 369; Eversole v. Chandler et al., 217 Ky. 148, 289 S. W. 215; Pulliam v. Gentry, 206 Ky. 763, 268 S. W. 557. Mrs. Head, in compliance with this principle, constantly and almost continuously expressed her anxiety to surrender the stock she had received, and demanded the return of her stock in the Louisville Gas & Electric Company. In fact, she refused to permit it to be delivered until she was intimidated by Wildenburg. She made a tender in her petition of the stock she had received.

An accepted rule is, a misrepresentation, to be actional, must concern an existing or a past fact, and not a future promise, prophecy, or opinion of a future event, unless declarant falsely represents his opinion of a future happening. Electric Hammer Corporation v. Deddens, 206 Ky. 232, 267 S. W. 207.

It is a settled rule that mere commendation, or even false representation by the seller of stock as to its value, when the purchaser has an opportunity to ascertain for himself such value by ordinary vigilance or inquiry, has no legal effect on the rights of the contracting parties, even when made with the intention to deceive. Bentley v. Stewart et al., 180 Ky. 23, 201 S. W. 978; McGuffin v. Smith et al., 215 Ky. 606, 286 S. W. 884, 886.

In the language of this court in McGuffin v. Smith et al.:

> "That is true as to value, but not as to facts on which to base an estimate of value, where the one claiming to be deceived is not shown to have at hand any reasonably available means of determining the truth of representations made to him about those facts."

The statements of the agents to Mrs. Head that, if she would invest in the stock they were offering to sell, she could get her money back "just like from the Louisville

Gas and Electric Company," and "they were going to pay 6% and the Louisville Gas and Electric Company were just going to pay 5% after a little while," and the promise the corporations "would pay 6% regularly all the time, promptly and would not have to wait a day," are within the rule that fraud may be predicated on the nonperformance of a promise, if the promise is accompanied by the present intention not to perform it and made to deceive the promisee.

According to the report of the certified accountant, the corporations, at the time the promise was made to pay 6 per cent. dividend regularly, were not earning and were unable to pay a dividend at all except partly out of the capital stock. It is evident there was no present intention to pay the dividend of 6 per cent. as promised by the agents in their statements to Mrs. Head for the corporations were not earning a dividend. They concealed from her the inability of the corporations to earn or pay a dividend without encroaching upon the capital. The so causing a false impression constituted a palpable fraud, even though the representation as far as it went was true, since such concealment was in fact a false representation of that which was disclosed as the whole truth. "A duty to speak may arise from partial disclosure; the speaker being under the duty of saying nothing, or to tell the whole truth." Dennis v. Thomson, supra; Adkins v. Stewart, 159 Ky. 218, 166 S. W. 984; Hays v. Meyers, 139 Ky. 440, 107 S. W. 287, 17 L. R. A. (N. S.) 284, 139 Am. St. Rep. 493. It was the duty of the agents after they began to inform the prospective purchaser, Mrs. Head, of the ability of the corporations to pay "6% regularly, all the time, promptly and she would never have to wait a day," to speak the whole truth and impart to her that the corporations had been paying the dividends not from the earnings, but partly from the capital. "A false impression may consist in a concealment of what is true as well as an assertion of what is false. * * * The suppression of truth is as vicious and disastrous as a false representation. The motive is the same in either case, and the result should be the same, since it is the intention that constitutes the fraud." Dennis v. Thomson, supra.

After the agents had closed the deal with Mrs. Head, she was induced to go to the office of the corporations, where she claims she was introduced to a number of people as a "member." She claims she did not

understand what was meant by declaring her a "member." The fact the agents had her go to the office where they indulged in such a practice indicates most strongly that they knew she was dissatisfied and were thus endeavoring to "salve" her injured feelings and interrupt her disappointment. Two physicians have testified as to the afflictions of Mrs. Head at the time she engaged in making the deal with the agents. Their testimony corroborates hers as to her mental and physical condition, and further establishes that naturally she was not mentally strong. Considering her age, her health, and her inexperience in business, it is very plain that she did not deal at arm's length with these loquacious, astute agents. Her age was observable, her inexperience was apparent, and her ignorance was known to the agents who double-teamed and exerted their skilled tactics to over-persuade her to exchange a high-grade investment for an inferior one. They knew the disparity in their market value, as well also her lack of information on these points. By arousing her fear of a 5 per cent. dividend instead of a 7 per cent. dividend on her investment, they encouraged and induced this naive and unsophisticated, aged and dependent woman to accept and surrender that which she owned for that which they had offered when in truth at that time the expert accountant's report disclosed not only its inferiority to the investment owned by her, but the precarious condition of the corporations. They had the advantage of her not knowing, or having an opportunity to know, the inferiority of the stock they were selling and the superiority of that which they were obtaining from her. They voluntarily took the position of advisers to an ignorant woman, persuaded her to rely on their judgment and fairness and by half truth, flattery, and fear, induced her to accept their statements as true, knowing her dependency upon them for information as to the value of the stock they were urging her to purchase, without which she was as helpless as a babe. Hunter v. Owens, 9 S. W. 717, 10 S. W. 376, 10 Ky. Law Rep. 651; Chess & Wymond Co. v. Simpson, 82 S. W. 601, 26 Ky. Law Rep. 893.

All these things make it patent Mrs. Head was over-reached. We are imperatively driven to the conclusion the chancellor was justified in his finding and in decreeing a rescission.

Therefore the judgment is affirmed on the original and cross-appeals.