## Bankers Bond Co. et al. v. Cox.

(Decided March 24, 1936.)

STITES & STITES for appellants.

DODD & DODD and J. BALLARD CLARK for appellee.

OPINION OF THE COURT BY CREAL, COMMISSIONER—
Affirming.

In 1927 W. W. Cox, a resident of Oldham county,

purchased through a representative of the Bankers Bond Company one bond for $1,000, known as the Commodore Apartment 6 per cent. serial gold bond, No. M-68, and two bonds for $500 each, known as Briarcliffe Apartment 6 per cent, serial gold bonds, Nos. D-61 and D-67, all of which were guaranteed as to payment of both principal and interest by the Metropolitan Casualty Insurance Company. On November 9, 1931, at the solicitation of another representative of the Bankers Bond Company, he exchanged these bonds for two $1,000 mortgage bonds, one against Bedford Apartments and the other against Winnsor Apartments, both located in Chicago, Ill.; the latter bonds, as to payment of principal and interest, being jointly guaranteed by New Jersey Fidelity & Plate Glass Insurance Company and Federal Surety Company.

In December, 1932, W. W. Cox instituted this action against Bankers Bond Company and Standard Accident Insurance Company, the latter being surety on a bond which the Bankers Bond Company was required to give in order that it might qualify as required by law as a dealer in securities in the state of Kentucky, and which indemnified purchasers of securities from loss by reason of fraud, deceit, or imposition on the part of the principal.

In addition to the foregoing facts, it is alleged in substance in the petition that plaintiff was induced and procured to make the exchange of bonds through false and fraudulent representation of a duly authorized agent of defendant Bankers Bond Company respecting the value of the bonds held by him and those proposed to be given in exchange, and also the advantages that would accrue to him by the transaction.

The prayer of the petition is for restoration to plaintiff of the bonds originally held by him or for judgment for the sum of $2,000, the alleged value of the bonds. The issues were completed by separate answers of defendants, each making a general denial of the fraud alleged in the petition.

The cause was transferred to equity, and on final hearing the chancellor rendered an opinion which is made a part of the record, and adjudged (a) that plaintiff recover $950, with interest from November 9, 1931, or (b) that defendants restore to plaintiff the original

bonds held by him or bonds of the same series, same numerical amounts, and same maturity, with coupons attached or accounted for if detached. It was further adjudged that defendants might at their option comply with either of the foregoing provisions of the judgment in full satisfaction thereof at any time within 30 days after the entry of same, but, in the event no election was made within that time, then the judgment should be paid according to provision A. Defendants are prosecuting this appeal.

It appears in evidence that in September prior to the transaction under consideration the Federal Surety Company went into the hands of a receiver, and early in the following year the New Jersey Fidelity Company went into the hands of the insurance department of New Jersey for liquidation. As we gather from the record and from briefs, the Metropolitan Casualty Insurance Company was or is in the process of reorganization, but the evidence shows that at all times it has been a going, solvent concern, and has never defaulted in the payment of principal or interest on bonds.

Mr. Wiltsie Gutherie, a resident of Oldham county, was employed by the Bankers Bond Company as a salesman of securities, and he and appellee had been intimately acquainted for a number of years, and appellee testified that prior to the exchange of the stocks he regarded Mr. Gutherie as a good friend. For brevity and a clear understanding of appellee's version of the conversations and negotiations leading up to the exchange of the bonds, we can do no better than quote from the evidence as it appears in the record. When asked to tell in his own way about the transaction, he said:

"At the time I owned a little sweet-shop at Crestwood, Kentucky, one afternoon Mr. Wiltsie Gutherie came in and he said that I was holding two bonds, two thousand dollar bonds or one thousand dollar and two five hundred dollar bonds which the company was taking up, and I said, 'Why are they taking them up?' He said, 'We are going to give you other bonds in place of them.' I said, 'Well, I don't understand why I should surrender my bonds. I haven't sent for you and I

never made any complaint. I have been drawing my interest regularly and I have never made any complaint to you, and I don't see why I should surrender them.' He says, 'I don't know a damn thing about it only my boss sent me out here to take these bonds up.' I said, 'Well, I haven't got the bonds. I have them deposited with the Crestwood State Bank and I think they are in Louisville, they have them in Louisville.' So when he left he said, 'Well, you had better either bring those bonds in or send them in right away.' * * * He said, 'Bring them in or send them in right away.' Well, it was either two or three weeks after that, I hadn't done anything about the bonds, he made his second visit to me and he said, 'We haven't heard from you in regard to those bonds.' I said, 'No, I haven't done anything.' 'Well,' he said, 'You know I told you you better attend to them right away.' I said, 'I know you did, but I still don't understand why I have to surrender my bonds.' He said, 'Well, now I am prepared to tell you.' He said, 'You have a rather weak bond with only one insurance company on it.' He said, 'You bought those from the Bankers Bond Company and we are trying to protect our customers, and in order to do that we are taking these bonds up and giving you a perfectly good bond with two insurance companies on it which will make you absolutely safe.' I said, 'Well, that sounds good to me, Wiltsie, and if that's the case I will surrender my bonds,' and I did so.''

Mr. Gutherie, called as a witness for appellant, testified that he suggested to Mr. Cox that he trade the bonds which he held for double insured bonds; that at the time he had been told the bond on the Commodore Apartment was secured by a mortgage on a building which had not been erected. When asked if that was his reason for trading Mr. Cox out of his bonds, he replied, ''Partially, I was told to exchange the bonds on single guaranty for double guaranty bonds.'' He further testified that at the time he did not know personally that the Federal Surety Company was in the hands of a receiver. He also stated that nothing was said to Mr. Cox concerning the basic or underlying security of any of the bonds.

Mr. Sedley, president of the Bankers Bond Company, testified that prior to the exchange of the bonds the Federal Surety Company had gone into the hands of a receiver; that the Metropolitan Casualty Insurance Company was still a going, solvent concern. It further appears from his evidence that the Bedford and Winnsor Apartments are in the hands of a receiver, but this occurred subsequent to the exchange of the bonds. He testified that he knew nothing about the transaction with Mr. Cox before it took place, but Mr. Gutherie was familiar with the conditions with respect to the Commodore Apartment property, and in discussion in the office it had been stated that, if customers could be gotten out of the situation of uncompleted property as security, it would be advantageous to the bondholder.

Mr. Graham, who is in charge of the trading and statistical department of the Bankers Bond Company, testified that around September or October there was a great deal of discussion concerning surety companies, and his company looked over the cards or holdings of their customers, and decided in this particular case to suggest to Mr. Cox that he exchange the Commodore and Briarcliffe bonds into Bedford Apartment bonds, and that, as he remembered, Mr. Cox was first approached in the middle of October and the trade was finally consummated on November 9, 1931. He talked the matter over with Mr. Sedley, and from time to time with other members of the sales organization, and that he suggested it might be a good trade for various reasons.

The evidence concerning the respective values of the securities in controversy takes a very wide range, and much of it is more confusing than enlightening or helpful. None of the securities involved were listed on any stock exchange, and apparently few sales were being made about the time of this transaction, and therefore it was difficult to produce evidence concerning their market value. Some of the evidence for appellee would indicate that the Briarcliffe and Commodore bonds were of much greater market value than the bonds he received in exchange; however, there is considerable evidence indicating that the values were about the same.

The chancellor found that there was no great dif-

ference or, as brokers express it, "spread" in values of the respective securities. He found that the relationship between the parties was such that it was the duty of appellant Bankers Bond Company to disclose to appellee all the facts known to it relative to these bonds; that appellee owned guaranteed bonds, which was known to Mr. Gutherie and his principal, and, in order to induce him to make the trade, two things were emphasized: (1) That he would receive better bonds than he then held, and (2) that the bonds he would receive were guaranteed by two insurance companies, while the original bonds were guaranteed by only one insurance company; that the officers of the Bankers Bond Company knew that the Federal Surety Company was in receivership, and it was their duty to disclose that fact to appellee, and, if it had done so, Mr. Cox would not have agreed to the exchange; that the failure to disclose all the facts constituted such constructive fraud as would authorize a court of equity to set aside the trade.

Counsel for appellants set forth the six elements necessary to constitute actionable fraud as recited in the case of Peake v. Thomas, 222 Ky. 405, 300 S. W. 885, and argue that appellee does not bring this transaction within the rule enunciated in that case, because, as stated by the chancellor, there was little, if any, difference in the value of the securities exchanged, and therefore appellee suffered no injury. They further argue in effect, if Mr. Gutherie did misrepresent or withhold the facts, appellee cannot recover because of lack of diligence upon his part in making investigation which would have disclosed the true state of facts. As supporting this contention, they cite and rely on Kentucky Electric Development Co.'s Receiver v. Head, 252 Ky. 656, 68 S. W. (2d) 1, 3, and quote therefrom an excerpt to the effect that mere commendation or false representation by a seller of stock concerning its value when the purchaser had the opportunity to ascertain for himself such value by ordinary vigilance or inquiry has no legal effect on the contract between the parties. But, as will be noted, the next paragraph of the opinion quotes from McGuffin v. Smith et al., 215 Ky. 606, 286 S. W. 884, wherein it is said:

"That is true as to value, but not as to facts on which to base an estimate of value, where the one

claiming to be deceived is not shown to have at hand any reasonably available means of determining the truth of representations made to him about those facts.''

Further on in the opinion it is said:

"The so causing a false impression constituted a palpable fraud, even though the representation as far as it went was true, since such concealment was in fact a false representation of that which was disclosed as the whole truth. 'A duty to speak may arise from partial disclosure; the speaker being under the duty of saying nothing, or to tell the whole truth.' Dennis v. Thomson, supra [240 Ky. 727, 43 S. W. (2d) 18]; Adkins v. Stewart, 159 Ky. 218, 166 S. W. 984; Hays v. Meyers, 139 Ky. 440, 107 S. W. 287 [32 Ky. Law Rep. 832], 17 L. R. A. (N. S.) 284, 139 Am. St. Rep. 493. * * * 'A false impression may consist in a concealment of what is true as well as an assertion of what is false. * * * The suppression of truth is as vicious and disastrous as a false representation. The motive is the same in either case, and the result should be the same, since it is the intention that constitutes the fraud.' "

All of this is reiterated in substance in Farmers' Trust Co. of Harrodsburg v. Threlkeld's Adm'x, 257 Ky. 211, 77 S. W. (2d) 616, 620, and the opinion further quotes with approval from 20 C. J. 144, wherein it is said:

"The tendency of modern days is not to extend, but to restrict the rule requiring diligence, and a similar rule, such as caveat emptor, and the rule granting an immunity from the dealer's talk and should deem the falsehood of the fraud feasor rather than the credulity of his victim.''

Appellee was satisfied with the bonds he held and had received, and would have continued to receive interest regularly if he had retained his bonds. The exchange was not made at his solicitation or suggestion, but was brought about by the insistence and persistence of Mr. Gutherie. He was told that they were double guaranty bonds, yet the knowledge of the seller that one of the guarantors was insolvent and in the hands of a receiver was withheld from him. Apparently the officers

of the Bankers Trust Company would have it appear that they were acting in the interest of appellee in taking up an inferior stock and replacing it with a better security, but it is difficult to reconcile this claim with their admission and the proof that they later disposed of the very shares they received from appellee to another customer. According to the evidence of the customer to whom the shares were sold, he paid in value a price much greater than the market value, as indicated by the evidence for appellants or as found by the chancellor. In the light of the evidence, it is manifest that the chancellor was quite generous toward appellants in his finding respecting the fraud as well as the value of the respective securities involved in the deal, and it will serve no good purpose to go further, since what we have already said demonstrates that the judgment is fully sustained by the evidence.

Every element necessary to constitute actionable fraud was present. In the circumstances, insistence that appellee is not entitled to relief because of his failure to use vigilance or due diligence is wholly without merit. He had a right to rely on the representations made by the salesman Mr. Gutherie. The true facts were not otherwise available to him nor was it incumbent to seek information elsewhere.

Appellants' insistence that fraud is never presumed is fully sustained by authorities, but the rule invoked has no application where, as in this instance, nothing is left to presumption and the facts and circumstances in evidence and the reasonable and legitimate inferences to be drawn therefrom clearly preponderate to establish the alleged fraud. The authorities hereinbefore referred to are conclusive of this and all other questions presented.

Judgment affirmed.