NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0197n.06
CASE NO. 18-5379

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| **RICHARD STANSBURY, *et al.*,** | ) | **FILED**<br>Apr 17, 2019<br>DEBORAH S. HUNT, Clerk |
| | ) | |
| *Plaintiffs-Appellants*, | ) | |
| | ) | |
| v. | ) | |
| | ) | **ON APPEAL FROM THE** |
| **HOPKINS HARDWOODS, INC., *et al.*,** | ) | **UNITED STATES DISTRICT** |
| | ) | **COURT FOR THE WESTERN** |
| *Defendants-Appellees*. | ) | **DISTRICT OF KENTUCKY** |
| | ) | |

**Before: BATCHELDER, SUTTON, and DONALD, Circuit Judges.**

**ALICE M. BATCHELDER, Circuit Judge.** The plaintiffs appeal the summary judgment for the defendants in this diversity action for fraud, breach of contract, and various tort claims arising from the entry into and rights under a timber deed. We AFFIRM.

**I.**

In December 2008, husband-and-wife Rick and Mary Stansbury purchased a 2,557-acre parcel of undeveloped forest land, commonly known as "Lapland" (hereinafter "the Lapland property"),[1] in Meade County, Kentucky, for about $4.15 million. Prior to the purchase, they had obtained a "timber cruise" for the property. A timber cruise is a survey of a forest area to locate and

---

[1] In July 2011, the Stansburys split the Lapland property into two tracts by selling a 792-acre portion, thereafter referred to as the "Yager tract," for about $1.8 million, though they retained timber rights for five years. They continued to own the remaining 1,765 acres, which was thereafter referred to as the "Kimball tract." The Timber Deed at issue in this case, between the Stansburys and Hopkins Hardwoods, covers both tracts (i.e., the entire Lapland property), albeit with slightly different harvesting conditions or provisions for the two tracts. While the parties and the district court discussed this division of the property, the two separate tracts, and their differing Deed provisions, these aspects of the property and the Deed are not material to the issues that survive to this appeal and, therefore, will not be addressed further. The Lapland property will be treated as one homogenous whole.

That said, one other item bears mention. In its opinions, the district court sometimes referred to the entire Lapland property as the "Kimball tract." As just explained, this apparent misnomer or inconsistency is immaterial for our purposes and receives mention here merely to prevent any confusion due to it.

estimate the quantity of harvestable timber according to species, size, quality, quantity, and pecuniary value. *See generally* U.S.D.A. Forest Serv. *Timber Cruising Handbook* (2000); Soc. of Am. Forester's *Dictionary of Forestry* (1998). Based on a recommendation from their financing bank, the Stansburys hired Harold Gordon, a timber appraiser from Mississippi, to conduct the cruise of the Lapland property (the "Gordon Cruise"), which estimated 6.5 million board feet of timber, valued at over $4.1 million. The Stansburys appear to have relied on the Gordon Cruise when purchasing the property in 2008 but, for whatever reason, appear to have doubted or disregarded it during the later negotiations for the sale of the timber rights, and the Timber Deed, which constitute the events relevant to this lawsuit.

The Stansburys believed that the timber rights for the Lapland property were worth about $3.5 million and sought to sell those rights to Hopkins Hardwoods Inc., which, for our purposes, comprises three individual defendants: Donald Hayes, Jimmy Speaks, and Robert Christ. Hopkins Hardwoods hired Rick Sluss, a forester from Tennessee, to perform a new timber cruise on the Lapland property in February 2010.[2] The "Sluss Cruise" estimated over 7 million board feet of timber on the Lapland property but did not provide a monetary estimate for that timber.

Hopkins Hardwoods gave the Stansburys a falsified version of the Sluss Cruise's Summary Page spreadsheet for purposes of negotiations, which led to the sale in September 2011 of the Lapland property timber rights to Hopkins Hardwoods for $2.2 million.[3] The Timber Deed specified that Hopkins Hardwoods had the right to harvest timber for a period of five years, but was not to harvest any cedar trees, was not to harvest any trees with a diameter smaller than 14 inches at stump

---

[2] In February 2010, Samuel Dunaway owned and operated Hopkins Hardwoods, as well as a related company, Dunaway Timber Co., which mills the lumber obtained by Hopkins Hardwoods. Robert Christ purchased both companies in December 2010 and was the President of Hopkins Hardwoods for the events at issue in this case, including negotiation and execution of the Timber Deed with the Stansburys in September 2011. Samuel Dunaway is not a party to this action.

[3] Hopkins Hardwoods actually paid $2.5 million ($1 million less than the Stansburys' personal estimate), but $300,000 went to Speaks and Hays as a finder's fee, which Christ said was split evenly between them.

height, and was to keep the gates locked at all times.  Hopkins Hardwoods began harvesting timber from the Lapland property in January 2012.

In January 2015, Gary Gouvas, the former son-in-law of Donald Hayes, revealed to the Stansburys that Hayes—and, by implication, Christ—had given them the altered version of the Sluss Cruise, which Gouvas had created.  This "Gouvas Cruise" had an estimate of 5 million board feet of timber, instead of the 7 million in the Sluss Cruise.  Gouvas testified that, in March 2010, Hayes had asked him to change the numbers in the Summary Page spreadsheet, and that Jimmy Speaks was also present when Gouvas made the change.  Gouvas explained that Hayes had told him the new spreadsheet was just for his (Hayes's) personal use.  For his part, Sluss testified that he did not prepare the spreadsheet that estimated only 5 million board feet of timber on the Lapland property.

The Stansburys sued Hayes, Speaks, Christ, and Hopkins Hardwoods in federal court, alleging 13 counts, including fraud, breach of contract, and various statutory and common law tort claims.  Hopkins Hardwoods counterclaimed and, eventually, all four defendants moved for summary judgment.  The district court granted partial judgment, denying the fraud claim and dismissing Hayes, Speaks, and Christ from the action.  The court initially denied summary judgment to Hopkins Hardwoods on the alleged breach of contract (concerning claims that Hopkins Hardwoods harvested cedar trees, harvested undersized trees, and failed to lock the gates), the alleged trespass (comprising claims that Hopkins Hardwoods had impermissibly cut certain trees and taken gravel), and the alleged violations of K.R.S. § 364.130.  *Stansbury v. Hopkins Hardwoods, Inc.*, No. 4:15-cv-00016, 2017 WL 1362076 (W.D. Ky. Apr. 11, 2017).

The district court set these remaining claims for a jury trial.  During the final pretrial conference, however, Hopkins Hardwoods argued that the Stansburys could not prove any damages from these claims beyond mere speculation.  The district court construed this as a renewed, oral

motion for summary judgment, granted the motion, determined that no claims remained to be tried, and ended the action. The Stansburys appeal.

## II.

We review the grant of summary judgment de novo, construing facts and inferences in the light most favorable to the non-moving party. *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 565 (6th Cir. 2016). Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Stryker Corp. v. Nat'l Union Fire Ins.*, 842 F.3d 422, 426 (6th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)).

## A.

The Stansburys argue that Hopkins Hardwoods fraudulently induced them to sell the Lapland property timber rights for $2.2 million, rather than $3.5 million, by falsifying the Sluss Cruise's estimate of available timber as only 5 million board feet, rather than the actual 7 million. The district court found the Stansburys' reliance on the falsified Sluss Cruise unreasonable.

In this diversity case arising in Kentucky, we apply Kentucky law. *Gahafer v. Ford Motor Co.*, 328 F3d 859, 861 (6th Cir. 2003). Under Kentucky law, fraud requires proof that the defendant (1) knowingly or recklessly made a (2) false and (3) material representation to the plaintiff, that (4) the plaintiff reasonably or justifiably relied on, such that it (5) induced the plaintiff to act and (6) caused injury to the plaintiff. *Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009). Only the fourth element is at issue here—specifically, whether the plaintiff's reliance must be "reasonable" or "justifiable." *Id*.

In *Flegles*, 289 S.W.3d at 549, the Kentucky Supreme Court acknowledged certain "recognized 'deception' exceptions to this general rule," but "emphasized [that] . . . these narrow exceptions do not relieve market participants, particularly experienced participants . . . , of their duty to protect themselves." Rather, "the law imposes upon recipients of business representations a duty

4

to exercise common sense." *Id.* (citing *Ky. Elec. Dev. Co.'s Receiver v. Head*, 68 S.W.2d 1, 3 (Ky. 1934) ("[W]hen the purchaser has an opportunity to ascertain for himself such value by ordinary vigilance or inquiry, [then a seller's false representation] has no legal effect on the rights of the contracting parties, even when made with the intention to deceive.")). Moreover, in a non-fiduciary situation, such as here, the parties negotiate at arm's length and a purchaser is not excused from exercising his own diligence and judgment. *Id.* at 551-52 (*relying on* Restatement (Second) of Torts § 542 cmt. d (1977) ("If the subject matter of the transaction is one upon which both parties have an approximately equal competence to form a reliable opinion, each must trust to his own judgment and neither is justified in relying upon the opinion of the other.")).

Here, the district court found that the Stansburys' reliance on the Gouvas Cruise was unreasonable. Each party had its own cruise of the Lapland property: the Stansburys had the Gordon Cruise, which estimated 6.5 million board feet of timber (at a value of $4.1 million), and Hopkins Hardwoods had the Gouvas Cruise, which estimated only 5 million board feet. The Stansburys claimed to have "trusted the valuation and the appraisal" in the Gordon Cruise, but "instead of approaching the Gouvas Cruise and its lower estimates with suspicion, [they] based the sale price of the timber rights solely on the Gouvas Cruise and ignored the Gordon Cruise." *Stansbury*, 2017 WL 1362076, at *3. This led the district court to question the reasonableness of the Stansburys' reliance on the Gouvas Cruise and find it lacking. Specifically, the court said:

> [The Stansburys] could have contacted Gordon to see if he could explain the discrepancies between the two cruises. [They] could have requested the full [Gouvas/Sluss] cruise from [Hopkins Hardwoods], rather than just a one-page summary [spreadsheet], to see if the cruises relied on different methods for arriving at their totals. [They] could have had another cruise completed. But [they] did none of these, making [their] reliance on the Gouvas Cruise unjustifiable.

*Id.* The court held that "[n]o reasonable jury would conclude that [the] Stansburys' reliance on the allegedly fraudulent representations made in the Gouvas Cruise was reasonable." *Id.* at *4.

On appeal, the Stansburys argue that even if—or even though—their reliance on the Gouvas Cruise was objectively unreasonable, this claim survives summary judgment because they subjectively "trusted" the Gouvas Cruise that Hopkins Hardwoods provided them. They cite three rather dated Kentucky high court opinions for the proposition that: "One who makes a material false representation upon which the other relies is liable . . . and . . . cannot escape [liability] on the ground that the complaining party should not have trusted him[] or was negligent in so doing." *Meyers v. Monroe*, 226 S.W.2d 782, 785 (Ky. 1950); *accord Bankers Bond Co. v. Cox*, 92 S.W.2d 790, 793 (Ky. 1936) ("The tendency of modern days is not to extend, but to restrict the rule requiring diligence, and a similar rule, such as caveat emptor, and the rule granting an immunity from the dealer's talk and should deem the falsehood of the fraud feasor rather than the credulity of his victim." (quotation marks and citation omitted)); *Farmers' Tr. Co. of Harrodsburg v. Threlkeld's Adm'x*, 77 S.W.2d 616, 620 (Ky. 1934) (same). The reasonableness requirement was not at issue in these cases, however, and it is at least arguable based on the facts recited in each of the opinions that the reliance *was* reasonable. In *Meyers*, 226 S.W.2d at 785, the seller told the buyer that the business would profit $1,000 per month, which was untrue, but only because of changed conditions unknown and unforeseeable to the buyer, so the buyer had no reason to doubt the false assertion. *Id.* ("[I]t is shown that after taking over the operation . . . the [buyer's] *business* was good . . . [but] about three weeks after [another] restaurant began operation[,] the [buyer's] *business* fell off to about $37.50 per day, without showing the net profit."). In *Bankers Bond*, 92 S.W.2d at 792, the aggrieved customer's reliance was presumptively reasonable as he was "not shown to have at hand any reasonably available means of determining the truth of representations made to him about those facts." And in *Farmers' Trust*, 77 S.W.2d at 619, the court emphasized that the recipient of a false statement cannot exercise "ordinary vigilance or inquiry" when he "is not shown to have at hand any reasonably available means of determining the truth of representations made to him about those

6

facts." In each of these cases the court found that the recipient of the false information had no reason to be suspicious of it, nor any ability to discover it, or basis on which to challenge it, indicating that the reliance was reasonable.[4]

The district court had determined that "the proposition for which these [three] cases stand is contradicted by the Kentucky Supreme Court's more recent opinion in *Flegles*, as that case clearly imposes a requirement that reliance be reasonable." *Stansbury*, 2017 WL 1362076, at *4. The Stansburys argue that the district court was mistaken, and that *Flegles* does not even apply to this case because *Flegles* concerned the misrepresentation of *future* events while the Gouvas Cruise was a misrepresentation of *present* facts. *See Phoenix Coal Corp. v. Winn*, No. 2011-ca-001303, 2012 WL 2899625, at *6 (Ky. Ct. App. July 13, 2012) (distinguishing *Flegles* on this basis).

There is certainly something repugnant in the notion that the law permits a purchaser to falsify a document and represent it as true in negotiating for a lower price, and to succeed with that deception due to his cunning or the seller's gullibility. On the other hand, there is something troublesome in the alternative presented here, that the law excuses the seller in such a negotiation from conducting his own due diligence, advocating for or defending his position, or even exercising common sense. Framed as a question, may one party to an arm's length negotiation "trust" the other—and if so, how much—or must each party carefully guard its own interests?

---

[4] In their Reply Brief, the Stansburys argue that *Meyers*, *Bankers Bond*, and *Farmers' Trust* create a bright-line rule, which the Stansburys label the "intentionally false exception" to reasonable reliance and phrase as: "when a party intentionally presents *false* information, [that party] cannot avoid liability for [its] own fraud based on an assertion that the recipient should not have 'reasonably relied' on such false information."

But this is neither a bright-line rule nor an exception to the general rule. A party "intentionally presents false information" in *every* fraud action. Fraud is an intentional tort in which someone "knowingly" presents false information to effectuate the fraud—it is the rare fraud action in which the false information is presented accidentally, unintentionally, or unknowingly. *Those* cases are the exception. Moreover, by including the word "reasonably" the Stansburys merely beg the question of whether the reliance was reasonable rather than creating an exception to the requirement that the reliance be reasonable. And, even if it were phrased properly, the cited cases do not support this proposition, as explained in the text. Whether done intentionally or unwittingly, the Stansburys have simply reconfigured their basic argument—that Kentucky law does not require that the plaintiff's reliance be reasonable.

It is perhaps noteworthy that the Stansburys do not argue that their "trust" in the defendants and the Gouvas Cruise was necessarily reasonable, or explain the basis for their trust, or point to any evidence—beyond their own assertion—that would illustrate for a jury the reality of that trust. That is, if the rule would be that the plaintiff's "subjective trust" must be reasonable, then the Stansburys have produced no evidence upon which a jury could find that they met that requirement. But that is not the rule they urge. Under their view, there is no reasonableness qualifier on the reliance—the plaintiff's reliance may be wholly unreasonable. Taken to an absurd length, for example, had the Gouvas Cruise been unmistakably farcical, handwritten in crayon and signed by "Smokey Bear," it would nonetheless satisfy the reliance requirement for fraud no matter how unreasonable such reliance would be in the eyes of any sentient juror. We are doubtful that the Kentucky Supreme Court would adhere to such a view, particularly in light of *Flegles*.

As a general principle, one could argue that the Stansburys' view could render the reliance element a nullity or, at most, a formality. Under Kentucky law, fraud has always required proof of six elements, one of which is that the plaintiff prove that he relied on the misrepresentation. *See Ross v. Powell*, 206 S.W.3d 327, 330 (Ky. 2007); *UPS v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999); *Sanford Const. Co. v. S & H Contractors, Inc.*, 443 S.W.2d 227, 231 (Ky. 1969); *Cresent Grocery Co. v. Vick*, 240 S.W. 388, 389 (Ky. 1922). But "unreasonable reliance" is not *reliance*, it is merely attribution or excuse easily concocted after the fact, which means that a requirement that the plaintiff prove reliance presupposes that the reliance was reasonable. The Stansburys have not pointed to any case law—nor have we found any in our research—that holds or even indicates that the requisite reliance need not be reasonable or may be unreasonable.

Nevertheless, the cases that the Stansburys do cite—*Meyers*, *Bankers Bond*, and *Farmers' Trust*—certainly support their proposition that their gullibility, misplaced trust, or negligence should not necessarily relieve Hopkins Hardwoods from liability for its deceit. But the Stansburys attempt

8

to stretch this proposition too far on these facts. We agree with the district court that *Flegles* represents the Kentucky Supreme Court's prevailing view that the reliance must be in some sense "reasonable," and we disagree with the Stansbury's contention that *Flegles* is distinguishable here because it addressed the misrepresentation of *future* events while this case concerns *present* facts. The question is the measure of reasonableness and whether that question should be submitted to a jury; i.e., whether any juror would find their reliance reasonable.

Given the present facts, it is clear as a matter of law that no reasonable juror could find the Stansburys' reliance reasonable. The Stansburys have pointed to no evidence upon which a reasonable juror could conclude that their reliance on the Gouvas Cruise or their purported trust in Hopkins Hardwoods was reasonable or justifiable. Nor, upon our careful review of the record, do we find any. The district court did not err in granting summary judgment on this claim.

**B.**

During the final pretrial conference, Hopkins Hardwoods argued that the Stansburys could not prove any damages from the remaining claims. The district court construed this argument as a renewed, oral motion for summary judgment, which it granted. On appeal, the Stansburys argue that Hopkins Hardwoods did not actually move for summary judgment anew or move to reconsider its prior motion for summary judgment, but that the district court granted summary judgment *sua sponte*, absent any motion. The Stansburys claim that this is reversible error, in violation of Federal Rule of Civil Procedure 7(b), which says, in pertinent part, that "[a] request for a court order must be made by motion."[5] Oddly, the Stansburys also insist that "all applicable provisions of Fed. R. Civ. P. 56 must be followed before a summary judgment can properly [be] granted." This leads us to Rule 56(f), which says:

---

[5] It perhaps bears mention that, when a court considers summary judgment, it is not considering "a request for a court order," but rather a final determination, i.e., judgment, in the action.

Judgment Independent of the Motion.  After giving notice and a reasonable time to respond, the court may:

    (1) grant summary judgment for a nonmovant;

    (2) grant the motion on grounds not raised by a party; or

    (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.

Fed. R. Civ. P. 56(f).  We have explained that "Rule 56(f) permits the district court to grant summary judgment on grounds not raised by a party so long as it provides notice and a reasonable opportunity to respond."  *Sadie v. City of Cleveland*, 718 F.3d 596, 601 (6th Cir. 2013).  Here, a review of the pretrial conference transcript reveals that the court gave the Stansburys notice of its concerns and an opportunity to respond, which they did.  We, therefore, find no merit to their claim.

But even "[i]f the district court improperly granted summary judgment on grounds not raised by the [appellee], the [appellants] must demonstrate prejudice in order to obtain relief on appeal." *Id*.  Here, the Stansburys have not argued on appeal that the district court erred on the merits—i.e., that they could prove damages at trial—they have argued only that the court erred by entering judgment without a pending motion.  Were we to vacate this judgment and remand on this basis, Hopkins Hardwoods could file its motion, satisfying the Stansburys' desired formality, and the district court could grant the same motion.  That is, the Stansburys show no prejudice.

## III.

For these reasons, we AFFIRM the judgment of the district court.