Carl T. **REIS, et al., Plaintiffs/Respondents,**

v.

**PEABODY COAL COMPANY, et al., Defendants/Appellants.**

No. 73915.

Missouri Court of Appeals,
Eastern District,
Division One.

Juné 8, 1999.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 19, 1999.

Application for Transfer Denied Aug. 24, 1999.

50 

W. Stanley Walch, Lawrence C. Friedman & Mike W. Bartolacci, St. Louis, for Appellants.

George A. Barton & Matthew S. Jensen, Kansas City, Robert F. Ritter & Jeffrey J. Lowe, St. Louis, for Respondent.

WILLIAM H. CRANDALL, Jr., Judge.

Defendants, Peabody Coal Co. (Peabody Coal), Peabody Development Company (Peabody Development), and Peabody Holding Company, Inc. (Peabody Holding), appeal from the judgment entered after a jury found for plaintiffs on their fraud claims.[1] We affirm.

## I.

In November 1963, C.A. Reis and Annie R. Reis, as lessors, entered into a mineral lease agreement with Sentry Royalty Company (Sentry). Under the terms of the lease, Sentry, as lessee, agreed to pay the Reises for the coal mining rights to certain property located in Kentucky. The lease requires Sentry to pay the Reises earned royalties, including "[f]our per cent (4%) on the monthly average gross sales realization to [Sentry]...." The lease defines gross sales realization, in part, as the "sales price without deduction of sales commission or expenses." The lease also contains what the parties refer to as a most favored nations clause that provides, "Should [Sentry] agree to pay other owners of coal land adjoining or adjacent higher royalty rates (no matter how based, i.e. per ton, per acre, or otherwise) than those set out hereinabove, thereupon those higher rates shall forthwith become the rates due and applicable to this lease and shall be paid by [Sentry] to [the Reises]." The lease requires Sentry to provide with each royalty payment a statement showing the amount of coal mined and "the monthly average gross sales realization f.o.b. [Sentry's] Preparation Plant for all coal prepared there and sold during said month."

The lease also contains arbitration and audit clauses. In January 1966, the Reises assigned their rights under the lease to the Green River Mine Trust (GRMT). Sentry's rights and obligations under the lease were assumed by Peabody.

In 1971, Kentucky enacted a severance tax for coal, section 143.010. In 1977 and 1978, Congress enacted two excise taxes for surface-mined coal, 26 U.S.C. Section 4121 and 30 U.S.C. Section 1232 which is designated as a reclamation fee by the Surface Mining Control and Reclamation Act of 1977 (SMCRA). Peabody billed its customers for the three taxes. Peabody mined coal on the GRMT property from January 1979 until May 1980, and from January 1986 until October 1990. When Peabody paid GRMT royalties, it excluded the sums received for the taxes from its calculation of gross sales realization under the lease.

In December 1972, Peabody entered into a lease agreement with Consolidation Coal Company (Consol) for the mining of property adjoining the GRMT property. This lease requires Peabody to pay Consol royalties at a rate of 4½ % of the monthly average gross sales realization. Peabody paid GRMT 4 % of the average gross sales realization for mining occurring from December 1972 until November 1987, and 4½ % for mining occurring thereafter.

GRMT invoked the arbitration clause of the lease in April 1992. GRMT claimed that Peabody breached the lease and committed fraud. GRMT sought punitive damages for Peabody's alleged fraudulent conduct. Peabody objected to GRMT's request for punitive damages, asserting that the lease did not authorize punitive damages. The arbitration panel determined that it lacked authority to consider

---

1. In its answer to plaintiff's petition, defendants admitted that since 1984, Peabody Coal has assigned portions of its rights and obligations under the parties' lease to Peabody Development. Defendants also admitted that Peabody Development and Peabody Holding are "affiliates" of Peabody Coal. Defendants denied plaintiffs' allegation that defendants acted in concert in committing the tortious acts complained of in the petition. For purposes of this appeal and unless otherwise stated, we shall refer to defendants, individually or collectively, as Peabody.

GRMT's fraud claims. After a hearing, the panel found that Peabody breached the lease by failing to include in its calculation of average gross sales realization those amounts that Peabody billed to and received from its customers for the three taxes. The panel also found that Peabody breached the lease's most favored nations clause by failing to increase GRMT's royalty rate to 4½ % in December 1972 when Peabody agreed to pay a 4½ % royalty to the lessor under the Consol lease. The panel awarded GRMT $708,721.32 for damages and pre-judgment interest. The United States District Court for the Eastern District of Missouri entered judgment and confirmed the arbitration award.

After arbitration, plaintiffs, the co-trustees of GRMT, brought an action in the Circuit Court of the City of St. Louis against defendants. Plaintiffs alleged that Peabody fraudulently excluded the three taxes from the monthly average gross sales realization in calculating the royalties due the trust. Plaintiffs also alleged that Peabody committed fraud prior to November 1987 by paying GRMT royalties at the rate of 4 % of monthly average gross sales realization instead of 4½ % as provided for in the Consol lease. Plaintiffs sought punitive damages for both fraud claims. Peabody moved to dismiss or, in the alternative, for summary judgment. Peabody argued that because GRMT arbitrated its contract claims, GRMT was barred by the doctrine of res judicata from litigating the fraud claims. The trial court denied Peabody's motions. This court dismissed Peabody's appeal from the judgments denying these motions for lack of appellate jurisdiction.

After certain discovery, Peabody renewed their motion for summary judgment. The trial court denied the motion. Peabody next filed a motion to compel arbitration and stay litigation pursuant to the Federal Arbitration Act and Missouri Arbitration Act. The trial court also denied this motion. Peabody appealed. This court affirmed the trial court's denial of Peabody's motion to compel arbitration and stay litigation because defendants waived the right to arbitrate. *Reis v. Peabody Coal Co.*, 935 S.W.2d 625, 632 (Mo. App. E.D.1996). We dismissed Peabody's appeal from other orders by the trial court for lack of appellate jurisdiction. *Id.*

The case then proceeded to trial. The evidence included a 1981 letter from Donan Engineering, Inc. to GRMT, a claim by Beaver Dam Coal Company (Beaver Dam) regarding the deduction of taxes in calculating royalties, and two decisions by the United States Interior Board of Land Affairs (IBLA). There was also evidence regarding a proposed internal accounting change by Peabody where it would include the taxes at issue as part of gross revenue.

A January 20, 1981 letter to a GRMT co-trustee from Donan Engineering, Inc. begins "As per your instruction, we have investigated and made the following conclusions concerning the [GRMT.]" The letter provides in part:

3. Refer[r]ing to the "most favorable nation clause", only one other coal owner is involved, the W.T. Fitts tract. According to Peabody, the Fitts property received the same royalty rate as does [GRMT]. We have not verified this further beyond taking Peabody's word. I would assume some representative of the Fitts tract would need to be contacted to get further verification. I will await further instruction from [GRMT] before attempting this verification.

4. The remaining objectives of our investigation involve[ ] retroactive adjustment made by Peabody concerning gross realization. After several conversations with Peabody, I have determined that these adjustments included positive and/or negative quality adjustments, adjustments due' to the [SMCRA], and possibly other adjustments unique to various sales contracts involved. These adjustments could only be verified by conducting a thorough audit of Peabody studies, accounting practices and contracts. This could turn out to be a

major project in itself and I do not believe you intended such verification in your original instructions. We have assumed the dollars of adjusted gross to be correct and verified that it was applied to correct tonnages.

The letter then provides that attempts were not been made to verify gross realization and corresponding retroactive dollar adjustments.

Beaver Dam, a Kentucky landowner, had a lease with Peabody for mining coal. The lease provides that part of the royalty to be paid by Peabody was based on gross realization for coal mined and sold. The lease defines gross realization as the "gross selling price of all merchantable coal invoiced f.o.b. mines to the customer or buyer, without any deductions for sales commissions." In October 1978, Beaver Dam's accountants examined Peabody's "books" and found that Peabody had been deducting the three taxes, at issue in the present case, in its calculation of gross realization. In January 1979, Beaver Dam told Peabody that in their opinion the taxes should not be deducted. Beaver Dam requested that Peabody reimburse the taxes deducted for all past royalties and include the taxes in its future royalties.

Peabody also had coal leases with the Navajo and Hopi Indian Tribes in Arizona. The two leases' definition of gross realization is nearly identical to that provided in the lease here. In 1978, the Indian tribes made claims for reimbursement after learning that the SMCRA tax was not being included in Peabody's calculation of gross realization. The District Mining Supervisor, Geological Survey, Bureau of Indian Affairs ordered Peabody to include the federal tax in the royalty base. The Acting Deputy Commissioner, Bureau of Indian Affairs, affirmed this decision and Peabody appealed to the IBLA. In 1981, the IBLA found that the tax should be included in the royalties and affirmed the decision. *Peabody Coal Co.*, 53 IBLA 261 (1981). The issue arose again in another claim by the Indian tribes against Pea-

body. In April 1983, the IBLA found that the two federal taxes at issue here and an Arizona tax should be included in calculating gross realization. *Peabody Coal Co.*, 72 IBLA 337 (1983). Peabody did not appeal from the two IBLA decisions. Peabody paid the Indian tribes at least $500,000 for past royalties and thereafter included the taxes when calculating royalties.

In 1985, A.R. Rosavage, Chief Financial Officer for Peabody Holding, asked W.H. Carson, Vice President of Accounting for Peabody Holding, to evaluate a proposed change of internal accounting procedure where the taxes would be reported as part of gross revenue as opposed to the then current method of reporting the taxes directly as liabilities. Part of one trial exhibit is a chart showing a comparison of Peabody Holding's rank on the Fortune 500 Directory without and then with the proposed accounting change. Carson asked controllers of the "various operating divisions" to send reports regarding the amount of the taxes that was collected and remitted.

In April 1985, T.S. Hilton was Peabody's Coal's controller for the eastern division which included GRMT's land. Hilton prepared a memorandum to Carson, addressing the accounting change. The memorandum provides the following observations by Jim Blackburn, who was employed in Peabody Coal's land department: (1) all royalties are currently paid on a realization basis "net of these taxes;" (2) for any new leases there is an attempt to specifically exclude the taxes; and (3) very few lessors perform formal audits of royalty payments, and that if lessors performed audits there is "some exposure" they would take exception to the exclusion of the taxes despite the accounting method. Hilton testified that his understanding of Blackburn's statements was that taxes were being deducted from the gross selling price and that the "exception" referred to was that lessors would make a claim against Peabody for the taxes. The mem-

orandum also provides that "[m]any of the leases on which we are currently excluding taxes for royalty calculation purposes, call for gross realization as the basis for royalties. I feel that were a detailed review of every lease performed, it would only confirm the risk that we have already acknowledged." Hilton testified that the "risk" he referred to was that lessors would make a claim against Peabody for the underpayment of royalties. The memorandum concludes by supporting the proposed accounting change.

After Carson received Hilton's memorandum and others from Peabody controllers he prepared a memorandum, dated May 10, 1985, for Rosavage. This memorandum discusses the proposed accounting change and provides in part:

> Our discussion with Messrs. Arnold and Kelly as well as Eastern's and Indiana's reports did indicate that certain of our old coal leases are silent as to whether the royalty percentages apply to sales including or excluding such taxes (all recent leases spell this out clearly and some are made each way). There is one particular override lease in Kentucky on which we pay about $8 million in royalties which is particularly troublesome in that we use the "gross" method of computing such taxes for the underlying lease [language redacted] whereas, we use the "net" method for the 5% override royalties on this same lease. The override royalties would increase about $800,000 per year (based on 1984's $8 million royalty) should the "gross" method be required. Obviously, this exposure exists regardless of the accounting method used to record these taxes; however, our legal position could be somewhat weakened if we used the gross method in our accounting while recording and paying the royalties on the net basis. With the underlying lease already on the gross method, we may not be in the strongest position anyway.

In the memorandum, Carson discusses advantages and disadvantages of the accounting change and listed as one disadvantage the "possibly weakened legal position for method of paying some royalties in Kentucky." Carson states that his "preference" was to make the accounting change "and to meet the disadvantages head on (particularly the royalty issue)."

In a subsequent memorandum, dated June 11, 1985, Carson informs Rosavage that approximately $8,000,000 to $10,000,000 in royalties were being paid under leases that were silent as to whether the taxes should be included in computations. Carson acknowledges that for those silent leases the taxes were not then included in the computations. Carson also states that it would cost $800,000 to $1,000,000 annually in increased royalty payments if the taxes were included. Carson states further that "[o]ne issue which you and I discussed was the fact that certain coal lease agreements are silent as to whether percentage royalties should or should not be paid on these taxes. Tom Hilton's attached memo dated April 12, 1985, describes this situation in more detail." Carson recommends that the accounting change should not proceed until the "Legal Department" reviewed the leases and "opined as to method of computing royalties."

A memorandum dated June 21, 1985, from Rosavage to F.L. Barkofske, Senior Vice President, Law and Government Affairs for Peabody Holding and described as the top ranking legal officer, asks for help from the legal department regarding the analysis of adding the taxes as part of the realization. Attached to this memorandum were the April, May, and June 1985 memoranda.

A memorandum from Carson dated August 16, 1985 states that the "current" accounting method would continue and therefore the taxes would not be treated as part of gross revenue. This memorandum is marked for "Distribution" and is not directed to any particular individual, but Rosavage and Barkofske were listed to receive copies of the memorandum. Car-

son testified that he made the decision not to make the accounting change.

Michael McKown worked for Peabody Coal's legal department and at various times performed work for Peabody Holding. At some point, Barkofske asked McKown to calculate the amount of money Peabody could be responsible for paying if the taxes were included in the calculation of royalties to various landowners in different states. In handwritten notes on his calculations, McKown refers to the states', including Kentucky's, statutes of limitations. McKown testified that he recognized the financial advantage to Peabody and disadvantage to a landowner if Peabody were successful in a statute of limitations defense. In a memorandum dated January 31, 1986, from McKown to Barkofske, McKown discusses Beaver Dam's claim and states that an audit by Beaver Dam revealed that Peabody was not including the taxes. McKown then states that "[t]he Peabody Law Department researched the issue and found the brief to be accurate."

The jury found for plaintiffs on their claim regarding Peabody's deduction of the taxes from monthly average gross sales realization. For this claim, the jury assessed punitive damages of $701,833 against each of the three defendants, Peabody Coal, Peabody Development, and Peabody Holding, for a total of $2,105,-499. The jury also found for plaintiffs on their claim regarding the payment of royalties prior to November 1987 at a rate of 4 % instead of 4½ %. The jury assessed punitive damages of $394,501 solely against defendant, Peabody Coal, for this claim. The trial court entered judgment and denied Peabody's motion for judgment notwithstanding the verdict or, in the alternative, for new trial. Peabody raises seventeen points on appeal.

## II.

■ We first consider conflict of laws principles. "A fundamental principle of conflicts is that a forum state will always apply forum procedure, but it will choose the applicable substantive law according to its own conflict of law doctrines." *Ernst v. Ford Motor Co.*, 813 S.W.2d 910, 921 (Mo. App.1991). For tort claims, Missouri applies the test set forth in the Restatement (Second) of Conflict of Laws Section 145 (1971). *Thompson v. Crawford*, 833 S.W.2d 868, 870 (Mo. banc 1992).

Section 145 provides:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in [section] 6.

(2) Contacts to be taken into account in applying the principles of [section] 6 to determine the law applicable to an issue include:

 (a) the place where the injury occurred,

 (b) the place where the conduct causing the injury occurred,

 (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

 (d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

The royalties were sent to GRMT at a Kentucky address. The leased premises were located in Kentucky. All of the mining occurred on land located in Kentucky. For the majority of time when mining occurred, Peabody's principal place of business was Kentucky. For the relevant period, GRMT's place of business was in Kentucky. Applying the test set forth in section 145, the trial court properly found that Kentucky law governs plaintiffs' claim for punitive damages and the "underlying" fraud claims.

The arbitration panel stated that both parties had "consistently assumed" that Kentucky law governed the dispute. In a trial brief supporting the application of Kentucky substantive law and on appeal, plaintiffs contend that the substantive elements of fraud are similar under both Kentucky and Missouri law but the two states' substantive law for punitive damages differs significantly. Peabody does not argue on appeal that Kentucky substantive law does not apply for this action. With one exception, Peabody failed to cite Kentucky cases in their original brief. Plaintiffs suggest that Peabody abandoned its points relied on because Kentucky law applies to substantive issues and therefore Peabody failed to cite any relevant authority. *See Martin v. McNeill*, 957 S.W.2d 360, 365–66 (Mo.App. W.D.1997); Rule 84.04(d). Peabody argues that Kentucky and Missouri law is the same and therefore it was unnecessary to cite Kentucky cases. We agree with the general proposition asserted by Peabody that if the substantive law of Kentucky and Missouri is the same that it is unnecessary to decide which states' laws apply. *See Hartford Accident and Indemnity Co. v. Travelers Ins. Co.*, 525 S.W.2d 612, 616 (Mo.App.1975). However, we must review both Missouri and Kentucky cases to determine if both states' laws are the same. Accordingly, citation to Kentucky cases in Peabody's original brief was relevant. Peabody did cite Kentucky cases in their reply brief. Under these circumstances, we decline to find that Peabody abandoned its points relied on.

### III

Peabody argues in its first nine points that the trial court erred in entering judgment for plaintiffs and denying the portion of its post-trial motion for judgment notwithstanding the verdict. Because this court applies the law of the forum to procedural issues, Missouri law controls the standard of review for these arguments. *Martinez v. Missouri Pacific Railroad Co.*, 327 S.W.2d 855, 859 (Mo. 1959); *see Harter v. Ozark–Kenworth, Inc.*, 904 S.W.2d 317, 320 (Mo.App. W.D.1995)(applying forum's standard of review for appeal of summary judgment).

If the plaintiff fails to make a submissible case, then entry of judgment notwithstanding the verdict for the defendant is proper. *Steward v. Goetz*, 945 S.W.2d 520, 528 (Mo.App. E.D.1997). To make a submissible case, substantial evidence is required for every fact essential to liability. *Id.* The question of whether the evidence in a case is substantial and whether the inferences drawn are reasonable present questions of law. *Id.*

In determining whether the plaintiff has made a submissible case, we view the evidence in the light most favorable to the plaintiff. *Id.* We presume that the plaintiff's evidence is true and give the plaintiff the benefit of all reasonable and favorable inferences to be drawn from the evidence. *Id.* We disregard the defendant's evidence that does not support the plaintiff's case. *Id.* However, we do not supply missing evidence or give the plaintiff the benefit of unreasonable, speculative or forced inferences. *Id.* The evidence and inferences drawn must establish every element and not leave any issue to speculation. *Id.*

### A.

For both fraud claims the jury was instructed on disjunctive theories of misrepresentation and concealment. The verdict director for the tax claim provides, in part, "First, Peabody misrepresented the amount of royalties due and owing to [GRMT] under the 1963 lease agreement, or concealed the fact that taxes were being deducted from gross realization in the calculation and payment of royalties to [GRMT]. . . ." The verdict director for the most favored nations claim provides, in part, "First, defendant, Peabody Coal represented to [GRMT] that there were no other adjoining landowners to whom [Peabody Coal] had agreed to pay a higher

royalty rate, or failed to disclose that Peabody Coal had agreed to pay an adjoining landowner a higher royalty rate than was being paid to [GRMT]. . . . " Peabody argues in its first point that the trial court erred by entering judgment on both fraud claims based on concealment because it had no duty to disclose information regarding royalty rates.

■ For a case of fraud based on suppression of a fact, a plaintiff must establish that the defendant had a duty to disclose a material fact. *Smith v. General Motors Corp.*, 979 S.W.2d 127, 129 (Ky.Ct. App.1998); *Osterberger v. Hites Construction Co.*, 599 S.W.2d 221, 227 (Mo.App. 1980). "It is, of course, well established that mere silence is not fraudulent absent a duty to disclose." *Smith*, 979 S.W.2d at 129. A duty to disclose may arise from a fiduciary relationship, from a partial disclosure of information, or from particular circumstances such as where one party to a contract has superior knowledge and is relied upon to disclose this knowledge. *Id.*

We first address whether Peabody partially disclosed information. Kentucky's highest court has discussed partial disclosure in cases involving the purchase of stocks and bonds. *Farmers' Trust Co. v. Threlkeld's Adm'x*, 257 Ky. 211, 77 S.W.2d 616 (1934); *Kentucky Electric Development v. Head*, 252 Ky. 656, 68 S.W.2d 1 (1934).

In *Kentucky Electric*, the plaintiff brought an action to rescind contracts for the purchase of stock alleging fraud and misrepresentation. *Kentucky Electric*, 68 S.W.2d at 2. In two transactions, the plaintiff traded utility stock for stock of the defendant company and two affiliates. *Id.* An "employee or official" of the defendant had told the plaintiff that she would receive 6 % dividends all the time, promptly, and " 'would not have to wait a day' " to receive these dividends. *Id.* This person also told the plaintiff that within two weeks her utility stock was to start paying 5 % instead of 7 %. *Id.* Approximately three months prior to the transactions, an

accountant advised the defendant's Board of Directors of the danger of paying dividends in excess of earnings and out of capital. *Id.* at 2–3. The accountant recommended that the defendant not pay dividends until earnings absorbed both deficits and large portions of the capitalized expenses. *Id.* at 3. The trial court held that the plaintiff was entitled to rescind the contracts and have the utility stock returned to her. *Id.* The appellate court affirmed the judgment, finding in part that the defendant's agents concealed from the plaintiff its inability to earn or pay a dividend without encroaching upon the capital. *Id.* at 4. The court then stated that "causing a false impression constituted a palpable fraud, even though the representation as far as it went was true, since such concealment was in fact a false representation of that which was disclosed as the whole truth. 'A duty to speak may arise from partial disclosure; the speaker being under the duty of saying nothing, or to tell the whole truth.' " *Id.*; *see Dennis v. Thomson*, 240 Ky. 727, 43 S.W.2d 18, 23 (1931). The court held that after the defendant's agents told the plaintiff the company would pay 6 % dividends as previously described the agents had a duty "to speak the whole truth and impart to her that the corporations had been paying the dividends not from the earnings, but partly from the capital." *Kentucky Electric*, 68 S.W.2d at 4.

In *Farmers' Trust Co.*, the court considered two separate actions for fraud that were brought against a trust company for actions arising from the sale of bonds to two persons. *Farmers' Trust Co.*, 77 S.W.2d at 617–18. One plaintiff testified that she told the defendant's secretary-treasurer that she wanted to invest in a " 'good note' " and asked " 'what did he have.' " *Id.* at 619. The secretary-treasurer handed the plaintiff a note and stated it was secured by a mortgage. *Id.* The secretary-treasurer did not tell this plaintiff that there was a prior lien on the land covered by the mortgage, the note was one

of four that were renewals of the maker's "indebtedness of long standing," and the maker habitually failed to meet his obligations. *Id.* at 620. The court then repeated the language from *Kentucky Electric*, regarding palpable fraud and a duty arising from partial disclosure. *Id.* As for this note, the court affirmed the judgment for the plaintiff. *Id.* at 621; *see also Bankers Bond Co. v. Cox*, 263 Ky. 481, 92 S.W.2d 790, 792 (1936).

Although partial disclosure is not specifically discussed, *Hall v. Carter*, 324 S.W.2d 410 (Ky.1959), is also instructive. In that case, the owners of an apartment house had a dispute with an adjoining landowner regarding the "true back line" of the apartment house property. *Hall*, 324 S.W.2d at 411. The apartment owners showed the property to the ultimate purchaser of the property but said nothing about the claims of the adjoining landowner. *Id.* at 412. The trial court concluded that the failure of the apartment owners to reveal the claim of the adjoining landowner and the failure to reveal that the lot was only fifty-eight rather than sixty feet deep, entitled the purchaser to rescind the sales contract. *Id.* The appellate court recognized that mere silence regarding something related to a transaction is not necessarily misrepresentation and does not itself constitute fraud. *Id.* "However, it is otherwise when the circumstances surrounding a transaction impose a duty or obligation upon one of the parties to disclose all of the material facts known to him and not known to the other party." *Id.* The court held that it did "not doubt that the [apartment owners] believed their lot had a depth of sixty feet, for that is the distance described in the deed which they had received; but after the controversy with their neighbor had arisen and while it remained unsettled, **we think there was an obligation upon their part to reveal the facts to the prospective buyer.**" *Id.* (emphasis added).

This court considered a case where the plaintiffs alleged that the defendants fraudulently concealed from the plaintiffs the existence of an outstanding deed of trust on a house that the defendants sold to the plaintiffs. *Osterberger*, 599 S.W.2d at 225. This court recognized that concealment of a fact that one has a duty to disclose serves as a substitute element for a false and fraudulent misrepresentation. *Id.* at 227. The defendants contended that the transaction at issue was an armslength transaction and therefore there was no duty to disclose to the plaintiffs the existence of the deed of trust. *Id.* This court stated that our courts have carved out a number of important exceptions to the rule of nonliability for failure to disclose material facts. *Id.* For example, "we have found that partial information may be as misleading and deceptive as active misrepresentation, and we have imposed a duty to disclose material facts where the defendant has invited plaintiff's confidence by making only a partial disclosure." *Id.* In affirming the trial court's rescission of the sale, this court found partial disclosure because one of the defendants explaining the contents of the sales documents omitted reference to the outstanding deed of trust and failed to insert the description of this encumbrance in any of the instruments in question. *Id.* at 228.

Review of the cases reveals that whether a partial disclosure occurred is dependent upon the particular circumstances of each individual case. Under the circumstances here, Peabody partially disclosed information.

The terms of the lease require Peabody to provide with each royalty statement the amount of coal mined and the monthly average gross sales realization. Peabody provided royalty statements showing the tons and royalty, followed by an amount that equals Peabody's calculation of average gross sales realization.[2] The state-

---

2. The royalty statements do not use the term "average gross sales realization." However,

accounting records by Peabody that were introduced at trial by defendants, use the terms

ments also provide the "TOTAL ROYAL-TY." Peabody also provided plaintiffs with statements regarding coal price adjustments. One statement for November 1979 to April 1980 has a section titled "ACTUAL MINE PRICE (AFTER ADJUSTMENTS)" and then lists a dollar amount. Under the comments section, the statement provides "These royalty calculations are due to retroactive price adjustments and SMCRA adjustments." The SMCRA tax is also referred to in the letter from Donan Engineering and another coal price adjustment statement. The SMCRA tax was one of the taxes Peabody deducted in its calculation of average gross sales realization.

The November 1979 to April 1980 statement has a section titled "ROYALTY PERCENTAGE APPLICABLE" and then lists 4 %. Several other documents reflect that the royalties were being paid at a 4 % rate. The statements also provide the total royalty. The letter from Donan Engineering provides "Referring to the 'most favorable nation clause', only one other coal owner is involved, the W.T. Fitts tract. According to Peabody, the Fitts property received the same royalty rate as does [GRMT]." This letter reflects that Peabody also provided GRMT with information regarding another adjoining landowner's lease. Peabody partially disclosed information and therefore had a duty to disclose information regarding the taxes and the Consol lease.

Peabody contends that it did not owe plaintiffs a duty of disclosure because plaintiffs had a contractual right to audit Peabody's records, and therefore the method used to calculate the royalties was "within the fair and reasonable reach of plaintiffs in the exercise of ordinary diligence." Peabody does not specifically address partial disclosure in its first point but states that, "[a]bsent a fiduciary relationship, a duty to speak exists *only* if the party asserting fraudulent concealment first shows both that the other party was in a position of superior knowledge *and* that the non-disclosed information was beyond his fair and reasonable reach in the exercise of ordinary diligence." Peabody contends that when the information is within a party's fair and reasonable reach this negates any duty of disclosure.

▪ Mere silence does not constitute fraud when it relates to facts open to common observation, or is discoverable by the exercise of ordinary diligence, or where the information is as accessible to one party as to the other. *Bryant v. Troutman,* 287 S.W.2d 918, 920–21 (Ky. 1956). Here, the duty to disclose arises from partial disclosure. Partial disclosure does not constitute mere silence. "It is firmly established that a partial and fragmentary disclosure, accompanied with the wilful concealment of material and qualifying facts, is not a true statement, and is as much a fraud as an actual misrepresentation, which, in effect, it is." 37 Am.Jur.2d *Fraud and Deceit* Section 151 (1968). When a party makes a partial disclosure, the party then has a duty to tell the whole truth. *Farmers' Trust Co.,* 77 S.W.2d at 620; *Osterberger,* 599 S.W.2d at 227; *see Ash Grove Lime & Portland Cement Co. v. White,* 361 Mo. 1111, 238 S.W.2d 368, 372–73 (1951). Furthermore, Kentucky and Missouri have recognized that the modern trend is not to extend but to restrict the rule requiring diligence in persons to whom representations are made, and to condemn the falsehood of the person making the representation, rather than the credulity of the victim.[3] *Farmers' Trust*

---

"GROSS REAL." and "ROYALTY RATE @ 4%." The numbers under these two terms correspond to those on the royalty statements. During trial, Peabody introduced the records after asking plaintiff, S. Lewis Guthrie, whether these accounting records along with other statements were sent to the GRMT

trustees. Guthrie responded "They appear to be," and the exhibits were admitted.

**3.** The due diligence analysis also arises in determining whether a plaintiff had a right to rely. *See Blaine v. J.E. Jones Construction Co.,* 841 S.W.2d 703, 707 n. 1 (Mo.App. E.D. 1992).

Co., 77 S.W.2d at 620; *Cantrell v. Superior Loan Corp.*, 603 S.W.2d 627, 637 (Mo.App. 1980). We find that the audit clause does not negate Peabody's duty to disclose.

Peabody relies primarily on the decision in *Hemenway v. Peabody Coal Co.*, 159 F.3d 255 (7 th Cir.1998), where the court considered another action against Peabody regarding its failure to include taxes for purposes of calculating royalties. That lease defines the sales price as the " 'average invoice price of coal mined, removed and sold.' " *Hemenway*, 159 F.3d at 257. The plaintiffs contended that the two federal taxes, at issue in the present case, and a mine closing fee were part of the sales price for the calculation of royalties. *Id.* The district court agreed and granted summary judgment for the plaintiffs on this issue but rejected the plaintiffs' additional contention that Peabody committed fraud. *Id.* The court dismissed the fraud claim pursuant to Fed.R.Civ.P. 12(b)(6). *Id.* at 261. In the present case, Peabody contends that the concealment allegations in *Hemenway* are identical to those presented here.

The court affirmed the district court's holding that the taxes were part of the sales price. *Id.* The court also affirmed the district court's dismissal of the plaintiffs' fraud claim. *Id.* at 261–63(applying Indiana law). The court discussed an audit clause in addressing the plaintiffs' argument that under Indiana law a non-fiduciary may have a duty to reveal information to its trading partner, if it has superior access to the facts and the other side is entitled to rely on its disclosure. *Id.* at 262. The court stated that the parties, as they were free to do, bargained about disclosure obligations. *Id.* The plaintiffs agreed "to disclosure of the tons of coal mined (but not price information), plus an opportunity to audit Peabody's books on demand." *Id.* The court also stated:

> Plaintiffs do not contend that Peabody has ever refused any mineral owner access to invoices and other price informa-

tion on demand; it is undisputed that when in 1978 Beaver Dam [ ], a mineral owner similarly situated to plaintiffs, inquired how Peabody was handling the new excise taxes and asked to see the books, they were promptly handed over. The existence of the taxes was public knowledge, so mineral owners had good reason to ask how Peabody was handling them. Peabody neither lied to nor stonewalled Beaver Dam, and plaintiffs do not offer any reason to suppose Peabody would have interfered with their exercise of their own audit rights. But plaintiffs, unlike Beaver Dam, did not ask, even after two Indian tribes had litigated their contractual claims to a successful (and public) conclusion in 1981 and 1983.

> Indiana disfavors punitive damages even when outright lies have been established. "The correct standard ... is whether ... the defendant acted with malice, fraud, gross negligence or oppressiveness which was not the result of a mistake of fact or law, honest error of judgment, overzealousness, mere negligence, or other human failing.

*Id.* (citations omitted). The court ultimately held that the plaintiffs' fraud claim failed because they were not lied to, the contract specifies what information Peabody was to disclose, and there was legal uncertainty about the meaning of the contract. *Id.* at 263.

We find *Hemenway* distinguishable. The court in *Hemenway* emphasized that the parties' contract did not require Peabody to state the sales or base price in any given month. *Id.* at 261. Peabody remained silent about the sales and base price "as was its right under the contract." *Id.* The court found that the plaintiffs "pleaded themselves out of court on the fraud theory by revealing that they located the 'fraud' in omissions from the royalty statements—for the statements conformed to the contract the parties had negotiated." *Id.* In the present case, the lease requires Peabody to provide the monthly average

gross sales realization with the royalty statements. Gross sales realization is defined in the lease.[4] Furthermore, there is no suggestion in *Hemenway* that Peabody partially disclosed information, and accordingly there is no discussion regarding partial disclosure in the *Hemenway* decision. Here, Peabody partially disclosed information. After partially disclosing information, Peabody had a duty to tell the whole truth. *See Farmers' Trust Co.*, 77 S.W.2d at 620; *Osterberger*, 599 S.W.2d at 227. Peabody's first point is denied.

## B.

■ Peabody argues in its second point that the trial court erred in entering judgment on both fraud claims that were premised on "affirmative misrepresentation" because Peabody did not make any false representations of fact. For plaintiffs' tax and most favored nations claims based on "affirmative misrepresentation," they were required to show that Peabody made a representation that was false. *Wahba v. Don Corlett Motors, Inc.*, 573 S.W.2d 357, 359 (Ky.Ct.App.1978); *Haberstick v. Gordon A. Gundaker Real Estate Co.*, 921 S.W.2d 104, 107 (Mo.App. E.D. 1996). A misrepresentation may be made by conduct calculated to mislead and fraudulently obtain an undue advantage. *Haberstick*, 921 S.W.2d at 109. Peabody contends that the monthly royalty statements were "silent" regarding the Consol lease, the sale price of coal, and other "particulars" regarding how the royalties were calculated.

■ Peabody represented the actual mine price in documents sent to GRMT.

The royalty statements include the term "TOTAL ROYALTY" with an amount listed below. The lease defines gross sales realization, in relevant part, as the "sales price without deduction of sales commission or expenses." By its royalty statements, Peabody represented that the amount due was based on the "the monthly average gross sales realization." Similarly, accounting records reflect the amount due and gross sales realization. For plaintiffs' fraud claim based on the taxes, there was sufficient evidence for the jury to find that Peabody made affirmative representations regarding the amount of royalties that were due under the lease.

The lease provides that when Peabody agreed to pay an adjoining landowner a higher rate than it was paying GRMT, no matter how based, that Peabody must "forthwith" pay GRMT the higher rate. In 1972, Peabody entered into the Consol lease agreement where it agreed to pay 4½ %. The record reflects that a rate of 4 % was paid from 1972 until 1987. There was sufficient evidence for the jury to find that Peabody made affirmative representations to GRMT that it had not agreed to pay a higher royalty rate to an adjoining landowner.[5]

Peabody again relies on *Hemenway*, emphasizing the statement by the court that Peabody did not lie to the plaintiffs.[6] *Hemenway*, 159 F.3d at 263. As previously discussed, in *Hemenway* Peabody remained silent about the sales and base price, "as was its right under the contract." *Id.* at 261. In the present case, Peabody made representations regarding

---

4. In the reply brief, Peabody states that "it is undisputed that Peabody's statements did not include the sales price of the coal." Although the royalty statements do not specifically list the sales price of the coal, the lease requires Peabody to pay 4 percent "on the monthly average gross sales realization." The lease defines "gross sales realization" in part as the "sales price without deduction of sales commission or expenses." (emphasis added); *see* discussion footnote 2, *supra*.

5. This holding is consistent with the decision in *Johns Hopkins Hospital v. Peabody Coal Co.*, 920 F.Supp. 738 (W.D.Ky.1996), discussed *infra*.

6. Because the plaintiffs' complaint in *Hemenway* did not "allege, with or without particularity, that Peabody told a lie, [ ] the district judge was entitled to limit his discussion to the possibility of deceptive omissions." *Hemenway*, 159 F.3d at 261.

the actual mine price, average gross sales realization, total royalty, and the applicable percentage. The language in *Hemenway* is not persuasive under the circumstances presented here.

Peabody further contends that any "implied" representation that the royalty checks were for the full amount owed are at most statements of opinion and therefore are insufficient for a claim of fraud. Peabody asserts that "fraud requires a misrepresentation of fact and cannot be premised on a misrepresentation of either opinion or law."

The general rule is that expressions of opinion, such as to a future event or for matters of law, are not sufficient for a fraud action. *Scott v. Farmers State Bank*, 410 S.W.2d 717, 720 (Ky.1966); *McDonald v. Goodman*, 239 S.W.2d 97, 99 (Ky.1951); *Trotter's Corp. v. Ringleader Restaurants, Inc.*, 929 S.W.2d 935, 940 (Mo.App. E.D.1996); *Uhle v. Sachs Electric*, 831 S.W.2d 774, 777–78 (Mo.App. E.D. 1992). Furthermore, "The generally recognized distinction between statements of fact and opinion is that whatever is susceptible of exact knowledge is a matter of fact, while that not susceptible is generally regarded as an expression of opinion." *Pitney Bowes Inc. v. Sirkle*, 248 S.W.2d 920, 922 (Ky.1952).

Here, the representations as to the actual mine price, average gross sales realization, total royalty, and the applicable percentage for calculating the royalties do not concern future events. These representations are also susceptible of exact knowledge and do not have the same characteristics of representations found to be expressions of opinion. *See Moseley v. Owensboro Municipal Housing Comm'n*, 252 S.W.2d 880, 881 (Ky.1952)(statement as to the amount a jury would allow in a condemnation proceeding was either a misrepresentation of law or expression of opinion); *Cooper v. Ensor*, 270 Ky. 670, 110 S.W.2d 461, 464 (1937)(language used by trustees as to probable or possible ef-

fect of certain persons bidding at public sale of land was expression of opinion); *Trotter's Corp.*, 929 S.W.2d at 940 (holding that predictions and opinions regarding future profitability of business cannot form a basis for fraud). Furthermore, "The general rule is that the expression of an opinion cannot constitute fraud; but the rule is not hard and fast. Whether a given representation is an expression of opinion or a statement of fact depends on the circumstances of the particular case." 37 C.J.S. *Fraud* Section 13 (1997). The general rule does not apply if in addition to expressing an opinion, material facts have been fraudulently concealed. *Id.*

In addition, Peabody did not state to GRMT that its legal opinion was that under the lease the taxes should not be included when calculating royalties. But rather Peabody deducted the taxes without informing GRMT. The present case is distinguishable from a case where a party states its legal opinion on a particular issue. *See McDonald*, 239 S.W.2d at 99 (doctor's statement that it was "legally compulsory" to have an autopsy performed ); *Lucas v. Enkvetchakul*, 812 S.W.2d 256, 260 (Mo.App.1991)(broker's statement regarding deductibility of real estate commission and other expenses); *Link v. Cox*, 529 S.W.2d 189, 191 (Mo.App.1975)(statement that a design was "copyrightable"). Peabody's second point is denied.

### C.

In its third point, Peabody argues that plaintiffs failed to establish "the intent or scienter element" for plaintiffs' claim regarding the taxes. Peabody contends that the evidence only showed that there was a possibility that some of its lessors might interpret their various leases differently than Peabody. To establish an action for fraud, a plaintiff must show that the material representation was "known to be false or made recklessly." *Wahba*, 573 S.W.2d at 359. To satisfy the "scienter" element, the representation must be made

with knowledge of its falsity or under circumstances that do not justify a belief in its truth. *Crawley v. Terhune*, 437 S.W.2d 743, 745 (Ky.1969).

In 1981 and 1983, the IBLA issued opinions finding that the taxes should be included in the calculation of royalties. After the 1983 decision, Peabody paid at least $500,000 to the Indian tribes for past royalties and thereafter included the taxes in its calculations. When Beaver Dam learned that the taxes were being deducted, it requested Peabody to reimburse the taxes deducted for all past royalties and include the taxes in the calculation of future royalties. A Peabody memorandum reflects that the "Peabody Legal Department" found that Beaver Dam's brief was correct. The evidence was sufficient for a jury to find that Peabody's representation was known to be false or made recklessly. *See Morrill v. Becton, Dickinson and Co.*, 747 F.2d 1217, 1222–23 (8 th Cir.1984).

Peabody claims that the lease was ambiguous and one cannot "frauduently" interpret an ambiguous contract. The ambiguity of a contract is relevant initially in the interpretation of a contract and thereafter for a determination of whether the contract was breached. However, as demonstrated by the arbitrators' award in this case, a party can be found to have breached a contract with ambiguous terms. For purposes of this fraud action, the inquiry is Peabody's intent regarding whether it breached the lease and therefore would be required to reimburse and pay additional royalties. *See Okland Oil Co. v. Conoco Inc.*, 144 F.3d 1308, 1315 (10 th Cir.1998)(holding that where the jury found that the defendant committed fraud, the ambiguity of the contract was irrelevant). The ambiguity of a contract does not constitute a bar to plaintiffs' fraud claim regarding the taxes. *See id.* The evidence discussed above is sufficient to create a fact question for the jury. Peabody's third point is denied.

### D.

■ Peabody argues in its fourth point that there was insufficient evidence of reliance for either fraud claim. Peabody contends that: (1) plaintiffs' only evidence was that their predecessors cashed royalty checks without any proof that they did so in reliance on a statement or omission by Peabody; (2) plaintiffs did not take or refrain from taking any action or otherwise change their position to their detriment in reliance on the alleged fraud; and (3) plaintiffs had no right to rely because of their contractual audit rights.

The United States District Court for the Western District of Kentucky considered this issue in another case against Peabody. *Johns Hopkins Hospital*, 920 F.Supp. at 742–44. In that case, the plaintiff brought an action alleging among other things that Peabody fraudulently misrepresented or concealed the underpayment of royalties. *Id.* at 742. As in the present case, the basis of the plaintiff's claim was Peabody's deduction of the three taxes from gross sales realization in the calculation and payment of royalties. *Id.* at 740–41. Peabody moved for summary judgment arguing that there was insufficient evidence to prove reliance and injury. *Id.* at 742. Peabody contended that the plaintiff did not and could not as a matter of law reasonably rely on Peabody to disclose the manner in which it calculated monthly average gross sales realization and that the plaintiff did not suffer any detriment as a result of Peabody's alleged failure to inform the plaintiff as to its interpretation of the coal lease. *Id.* Peabody also asserted that the plaintiff did not have the right to rely on its misrepresentation and concealments because the lease contained an audit clause. *Id.* at 743.

The district court applied Kentucky law and noted it had not found a Kentucky case addressing reliance on misrepresentations regarding amounts due and owing in accepting payments. *Id.* at 742. The court recognized that other courts "have consistently held that the reliance element

of actionable fraud is satisfied when a plaintiff accepts payments in reliance upon representations which intentionally understate the amount due." *Id.* (citing *Braswell v. ConAgra,* 936 F.2d 1169, 1174 (11th Cir.1991); *Morrill,* 747 F.2d at 1223–24; *L.C.L. Theatres, Inc. v. Columbia Pictures Industries,* 421 F.Supp. 1090, 1100 (N.D.Tex.1976))(parentheticals omitted). The court recited the plaintiff's "proof" as: (1) Peabody consistently deducted the taxes which were part of the selling price of the coal from gross sales realization in calculating and paying royalties to the plaintiff; (2) none of the royalty statements sent to the plaintiff's agent gave any indication that Peabody was deducting taxes from gross sales realization in its calculation and payment of royalties; and (3) Peabody periodically mailed price adjustments that affirmatively misrepresented the royalties were being paid upon the actual mine price of the coal. *Id.* at 743. The court held that this evidence was sufficient to "undergird" a jury finding that the plaintiff relied upon Peabody's calculations.[7] *Id.* Here, plaintiffs also presented this evidence.

In addressing the audit clause, the district court stated that the clause did not give the plaintiff the right to audit Peabody's records regarding the gross sales realization for the coal mined and sold from the leased premises. *Id.* Therefore, the audit rights did not preclude the plaintiff from relying on Peabody's alleged misrepresentations and concealments. *Id.* However, the court in *Hemenway* stated

that the audit clause spoke directly only to tonnage of coal mined, but by permitting the audit to extend to the sale of coal it implied that mineral owners could review shipping documents, such as invoices.[8] *Hemenway,* 159 F.3d at 262.

The audit clause in the present case provides that GRMT could examine Peabody's records pertaining to the coal mined, sold, or used. Even assuming, as the court did in *Hemenway,* that the audit clause here would have permitted GRMT to review invoices, which disclosed that the taxes were part of the sales price, this does not require a holding that the jury could not find reliance. In *Morrill,* the court considered a defendant's argument that "full information was readily available" and the plaintiff could have discovered misrepresentations regarding royalties due under patent license agreements by asserting his right under the agreements to inspect the defendant's books and records. *Morrill,* 747 F.2d at 1223–24 (applying Missouri law). The court stated that "[t]he opportunity for investigation will not of itself preclude the right of reliance." *Id.* The court also stated that "[i]n Missouri, the trend in modern cases is to require less diligence, rather than more, in persons to whom representations are made and to condemn the falsehood of the person making the representation, rather than the credulity of the victim." *Id.* at 1223. The court held that the defendant's argument "at best" established that there was conflicting evidence on the plaintiff's right

7. The court declined to address what it referred to as the plaintiff's constructive fraud claim. *Johns Hopkins Hospital,* 920 F.Supp. at 743 n. 2. In a subsequent order, the court considered the plaintiff's complaint and royalty agreement and found that no fiduciary relationship existed between Peabody and the plaintiff. *Johns Hopkins Hospital v. Peabody Coal Co.,* No. 92–64 (W.D.Ky.August 6, 1996). The court held that Peabody therefore had no duty to disclose information and dismissed the portion of the plaintiff's claim based on nondisclosures. *Id.* The court held that only the portion of the fraud claim based on al-

leged misrepresentation survived Peabody's summary judgment motion. *Id.* Here, the duty to disclose arises from partial disclosure.

8. The court also noted that the existence of the taxes was public knowledge and therefore mineral owners had good reason to ask how Peabody was handling them. *Hemenway,* 159 F.3d at 262. However, fraud may be predicated on a false representation or concealment although the truth could have been ascertained from public records. *Cowles v. Johnson,* 297 Ky. 454, 179 S.W.2d 674, 675 (1944); *Osterberger,* 599 S.W.2d at 228.

to rely and the evaluation of this evidence was for the jury. *Id.* at 1224.

In our discussion of Peabody's first point, we stated that Kentucky and Missouri have recognized that the modern trend is not to extend but to restrict the rule requiring diligence. *Farmers' Trust Co.*, 77 S.W.2d at 620; *Cantrell*, 603 S.W.2d at 637. For both the tax and most favored nations claims, the jury was instructed that to return a verdict for plaintiffs it must find that "the trustees used the degree of care that would have been reasonable in the trustees' situation." *See* MAI 23.05. During closing argument, Peabody raised this issue with the jury stating that under the lease's audit clause plaintiffs could look at any of the records "which would have told them exactly how it was being done." As in *Morrill*, we do not find that the audit clause precludes a finding of reliance but rather presented an issue for the jury.

■ Peabody also contends under this point that "breach of an existing contract cannot give rise to tort liability." The mere breach of a promise or failure to perform does not constitute a misrepresentation of fact or create an action for fraud. *Titan Construction Co. v. Mark Twain Kansas City Bank*, 887 S.W.2d 454, 459 (Mo.App. W.D.1994); *see State ex rel. William Ranni Associates, Inc. v. Hartenbach*, 742 S.W.2d 134, 140 (Mo. banc 1987)(holding that mere failure to perform a contract cannot serve as the basis of tort liability for negligence). However, a plaintiff may recover under both breach of contract and fraud theories if the plaintiff establishes an independent tort. *Morrill*, 747 F.2d at 1222 (stating, "It is clear that under Missouri law, liability in tort may co-exist with liability in contract arising out of the same events"); *see Okland*, 144 F.3d at 1314–15; *State ex rel. William Ranni Associates*, 742 S.W.2d at 140. Kentucky courts have also held that if the breach of contract includes separately tortious conduct, a jury may award punitive damages. *Faulkner Drilling Co. v. Gross*,

943 S.W.2d 634, 638–39 (Ky.Ct.App.1997); *Audiovox Corp. v. Moody*, 737 S.W.2d 468, 471 (Ky.Ct.App.1987); *see Hanson v. American National Bank & Trust Co.*, 865 S.W.2d 302, 310 (Ky.1993). There is sufficient evidence here for plaintiffs' two fraud claims and Peabody's contention fails. Peabody's fourth point is denied.

### E.

■ In its fifth point, Peabody argues that the trial court erred in entering judgments on both fraud claims because there was no evidence of actual damages. Peabody asserts that by the time plaintiffs initiated this action, they had been fully compensated for Peabody's failure to include the taxes in gross realization and for the difference between the 4 % and 4 ½ % rate for coal mined prior to November 1987. A plaintiff seeking to recover on the basis of fraud must suffer an actual loss. *Stahl v. St. Elizabeth Medical Center*, 948 S.W.2d 419, 423 (Ky.Ct.App.1997); *MLJ Investments, Inc. v. Reid*, 905 S.W.2d 900, 901 (Mo.App. E.D.1995).

In its judgment on Peabody's post-trial motion, the court stated, "[i]n the present case plaintiffs showed, and the jury found, that they suffered actual damage. The reason for the lack of an award of actual damages in the present proceeding is not because of a lack of evidence but rather because of the unusual procedural posture of the case in which the fraud and contract claims were severed upon [Peabody's] motion, and an award of actual damages was made on the contract claim in the arbitration proceeding." We agree.

GRMT sought arbitration under the terms of the lease for both its breach of the lease and fraud claims. GRMT requested punitive damages for Peabody's fraudulent conduct. Peabody objected to GRMT's request for punitive damages, asserting that the lease did not authorize punitive damages. Thereafter, the arbitration panel determined that it lacked the authority to consider GRMT's fraud claims. The arbitration panel found that

Peabody breached the lease and awarded damages. Here, the reason for the lack of an actual damages award at trial was that the award of actual damages was made by the arbitrators. Furthermore, for both the tax and most favored nations claims, the jury was instructed that to enter a verdict for plaintiffs it was required to find that GRMT was damaged. The failure of an award of a specific dollar amount is based on the procedural history of this case. In addition, the court in *Johns Hopkins Hospital* held that, "[a]cceptance of inadequate royalty payments establishes injury sufficient to meet the injury element of actionable fraud." *Johns Hopkins Hospital*, 920 F.Supp. at 743.

Peabody's reliance on *MLJ Investments, Inc.*, is misplaced. In that case, this court held that the jury's finding of actual damages was not supported by substantial evidence. *MLJ Investments, Inc.*, 905 S.W.2d at 902. Here, there was evidence of actual damages. Under the circumstances presented here, we find no error in the trial court's entering judgment for plaintiffs. Peabody's fifth point is denied.

**F.**

▋ Peabody argues in its sixth point that there was no evidence of any of the elements of fraud for the most favored nations claim. Peabody contends that the only evidence of intent were two Peabody memoranda that indicated Peabody believed it was complying with its lease obligations. We disagree.

The lease provides, "Should [lessee] agree to pay other owners of coal land adjoining or adjacent higher royalty rates (no matter how based, i.e. per ton, per acre, or otherwise) than those set hereinabove, thereupon those higher rates shall forthwith become the rates due and applicable to this lease and shall be paid by [lessee] to the [Reises]." The language is clear and unambiguous, when Peabody agreed to pay an adjoining landowner a higher royalty rate, this higher royalty rate was to be paid to GRMT. The unambiguous language of the lease is relevant for this point because it provides evidence regarding Peabody's knowledge as to whether it breached the lease. In December 1972, Peabody agreed to pay an adjoining landowner, Consol, a higher rate. Peabody did not pay the higher rate for mining occurring prior to November 1987. The evidence was sufficient for the jury to find the requisite intent for plaintiffs' most favored nations claim. *See Wahba*, 573 S.W.2d at 359. Peabody does not address any other elements of fraud under this point. Peabody's sixth point is denied.

**G.**

In its seventh point, Peabody argues that plaintiffs failed to make a submissible case for punitive damages for either the tax claim or the most favored nations claim. We will also address Peabody's arguments in its twelfth point that a new trial is required because of errors relating to the punitive damages instruction. Peabody contends that: (1) plaintiffs' claims for punitive damages are governed by Missouri law; (2) even if Kentucky law applied to the plaintiffs' punitive damages claims, the court should have submitted a Missouri Approved Instruction; (3) there was no evidence of malice; and (4) plaintiffs failed to prove any actual damages.

In 1988, the Kentucky legislature enacted sections 411.184 and 411.186. *Williams v. Wilson*, 972 S.W.2d 260, 261 (Ky.1998). By their language, these statutes apply in all cases where punitive damages are sought. Section 411.184(2) states that "[a] plaintiff shall recover punitive damages only upon proving, by clear and convincing evidence, that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud or malice." Section 411.184 defines oppression, fraud, and malice.[9] The following instruction

9. After the trial, the Kentucky Supreme Court held that section 411.184(1)(c), which defines malice and requires subjective awareness, violated the jural rights doctrine and was un-

submitted to the jury, identical in pertinent part for both claims, is patterned after sections 411.184 and 411.186.

> If you find in favor of [GRMT] ... and if you believe by clear and convincing evidence that [Peabody] acted toward [GRMT] with fraud, oppression or malice, then in addition to damages awarded in arbitration you may in your discretion award punitive damages against [Peabody].
>
> As used in this Instruction:
>
> "Fraud" means an intentional misrepresentation, deceit or concealment of material fact known to [Peabody] and made with the intention of causing injury to [GRMT];
>
> "Oppression" means conduct that was specifically intended by [Peabody] to subject [GRMT] to cruel and unjust hardship; and
>
> "Malice" means (a) conduct that was specifically intended by [Peabody] to cause tangible or intangible injury to [GRMT]; or (b) conduct that was carried out by [Peabody] with both a flagrant indifference to [GRMT's] rights and a subjective awareness that such conduct would result in financial damage to [GRMT].
>
> If you award punitive damages, in determining the amount thereof you should consider the following factors:
>
> (a) the likelihood at the time of such misconduct by [Peabody] that serious harm would arise from it;
>
> (b) the degree of [Peabody's] awareness of that likelihood;
>
> (c) the profitability of the misconduct to [Peabody];
>
> (d) the duration of the misconduct and the concealment of it by [Peabody]; and
>
> (e) the actions by [Peabody] to remedy the misconduct once it became known to [it].

constitutional. *Williams*, 972 S.W.2d at 269. The instruction submitted in the present case was presumably more favorable to Peabody

Peabody's proposed instruction, rejected by the trial court, is patterned after MAI 10.01 and provides:

> If you find the issues in favor of plaintiff, and if you believe the conduct of [Peabody] as submitted in Instruction Number __[verdict director] was outrageous because of [Peabody's] evil motive or reckless indifference to the rights of others, then in addition to any damages to which you find plaintiff entitled under Instruction Number __ [general damage instruction], you may award plaintiff an additional amount as punitive damages in such sum as you believe will serve to punish [Peabody] and to deter defendants and others from like conduct.

Peabody asserts that punitive damages are procedural in nature and therefore the law of the forum should be applied. The United States District Court for the Northern District of Iowa has discussed whether punitive damages raise substantive or procedural issues. *Harlan Feeders, Inc. v. Grand Laboratories, Inc.*, 881 F.Supp. 1400, 1405–10 (N.D.Iowa 1995)(discussing conflict between Iowa and Nebraska law regarding punitive damages). In finding that punitive damages involve substantive law rather than procedural law, the court recognized that Iowa adopted the modern choice of law rules formulated in accordance with the Restatement (Second) of Conflict of Laws Section 145(1). *Id.* at 1407. The court then quoted the Restatement (Second) of Conflict of Laws Section 171, which discusses the conflict of law rules for damages. *Id.* at 1408. Section 171 provides that "[t]he law selected by application of the rule of [section] 145 determines the measure of damages." Comment d to this section states that "[t]he law selected by application of the rule of [section] 145 determines the right to exemplary damages." Applying the conflicts of law rules of the Restatement, the court found that punitive damages are

than the one the court reinstated in *Williams*. *Owens–Corning Fiberglas Corp. v. Golightly*, 976 S.W.2d 409, 411 n. 1 (Ky.1998).

a matter of substantive law governed by the law of the state selected by application of the conflict of laws rules. *Id.* The court also stated that it "found no authority that runs contrary to the proposition that punitive damages are a matter of substantive law, and the applicable law must be determined by application of the most significant relationship test." *Id.* at 1408–09 (citations omitted).

We find the analysis in *Harlan Feeders* persuasive. As previously discussed, Missouri applies the test set forth in the Restatement (Second) of Conflict of Laws Section 145. *Thompson,* 833 S.W.2d at 870. Under section 171 of the Restatement, application of section 145 determines the rights to punitive damages. To award punitive damages, MAI 10.01 requires certain findings, including outrageousness because of evil motive and reckless indifference. Therefore, this instruction establishes substantive requirements and a substantive defense for a punitive damages award. *See Harlan Feeders,* 881 F.Supp. at 1408. This result is also consistent with our Supreme Court's holding that "[t]he measure and elements of damages are controlled, in tort actions, by the law of the place where the tort was committed, since this pertains to the substance of the right and not to the remedy." *Stevens v. Missouri Pacific Railroad Co.,* 355 S.W.2d 122, 131 (Mo. 1962).

Peabody's reliance on *Vaughan v. Taft Broadcasting Co.,* 708 S.W.2d 656 (Mo. banc 1986), is misplaced. In that case, the court considered whether the amending of the service letter statute, section 290.140 RSMo.1986, prohibiting the award of punitive damages, applied retroactively. *Vaughan,* 708 S.W.2d at 659–60. The court held that punitive damages are remedial and a plaintiff has no vested right to such judgment prior to the entry of judgment. *Id.* at 660. However, the court did not discuss whether under conflict of laws principles punitive damages are substantive or procedural.

 As we initially stated, under the Restatement the trial court properly found that Kentucky law applies to the punitive damages claim. Peabody contends that even if Kentucky law applies to plaintiffs' punitive damages claims, the trial court was still required to submit an instruction patterned after MAI 10.01. Although Kentucky substantive law applies, Missouri applies its standards regarding whether an MAI instruction should be submitted. *Meredith v. Missouri Pacific Railroad Co.,* 467 S.W.2d 79, 82 (Mo.1971). Use of Missouri Approved Instructions is mandatory in any case where the instructions are applicable. *Smith v. Kovac,* 927 S.W.2d 493, 497 (Mo.App. E.D.1996); Rule 70.02. However, Rule 70.02 recognizes that the approved instructions may not be appropriate to every factual situation. *Smith,* 927 S.W.2d at 497. The rule provides for the drafting of a not-in-MAI instruction. *Id.* The test for a not-in-MAI instruction is whether it follows the applicable substantive law and can be readily understood by the jury. *Id.; Higgins v. Star Electric, Inc.,* 908 S.W.2d 897, 906 (Mo.App. W.D.1995).

The inquiry here is whether Peabody's proposed instruction patterned after MAI 10.01 correctly states the substantive law of Kentucky. *See Meredith,* 467 S.W.2d at 82. Peabody does not argue on appeal that Kentucky and Missouri law on punitive damages is the same. But rather, Peabody contends that "[c]ontrary to Missouri law, which requires an additional finding of malice," the Kentucky instruction permitted the jury to impose punitive damages based on a finding of "fraud alone." Sections 411.184 and 411.186 do not specifically require a finding of outrageous conduct because of a defendant's evil motive or reckless indifference to the rights of others as required under MAI 10.01. Accordingly, Kentucky and Missouri law is not the same for punitive

damages.[10] Submission of Peabody's instruction patterned after MAI 10.01 would have been improper.

■ Under Kentucky law if a jury finds fraud, oppression or malice, as those terms are defined, then the jury may award punitive damages. The instruction submitted follows Kentucky law and could be readily understood by the jury. The trial court did not err in submitting the instructions given and refusing to submit the instruction patterned after MAI 10.01.

Peabody also contends that there was no evidence of malice and "punitive damages may only be imposed when the defendants acted with an evil motive." Peabody also asserts that there must be proof of malice in addition to the fraud. Peabody's argument relies on Missouri cases discussing this state's requirements for punitive damages and therefore Peabody's reliance on these cases is misplaced.

Peabody further contends that plaintiffs failed to establish actual damages because their only damages were contractual underpayments for which they had been compensated prior to filing this action. Punitive damages are not recoverable for mere breach of contract. *Faulkner Drilling Co.*, 943 S.W.2d at 638–39; *Audiovox Corp.*, 737 S.W.2d at 471. As we stated earlier, if the breach of contract includes separately tortious conduct, the jury may be instructed on and award punitive damages. *Id.; see Hanson*, 865 S.W.2d at 310. The reason for the compensation prior to trial is discussed above. Peabody's seventh and twelfth points are denied.

### H.

■ Peabody argues in its eighth point that both fraud claims are barred by theories of res judicata and the "related principle" of election of remedies. Peabody contends that the trial court erred by permitting plaintiffs to pursue, albeit under a different legal theory, the same claims

that were arbitrated. Peabody cites to our Supreme Court's holding in *King General Contractors, Inc. v. Reorganized Church of Jesus Christ of Latter Day Saints*, 821 S.W.2d 495 (Mo. banc 1991).

■ Res judicata applies "to every point properly belonging to the subject matter of litigation and which the parties, exercising reasonable diligence, might have brought forward at the time." *King General Contractors*, 821 S.W.2d at 501. The res judicata doctrine "takes on the character" of the rule against splitting an action. *Id.* In discussing res judicata, the court quoted the Restatement (Second) of Judgments Section 24 (1982), which provides in part:

> Dimensions of "Claim" for Purposes of Merger or Bar—General Rule Concerning "Splitting"
>
> (1) When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar ... the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.

*Id.*

However, the Restatement (Second) of Judgments Section 26 (1982), titled "Exceptions to the General Rule Concerning Splitting," provides:

> (1) When any of the following circumstances exists, the general rule of [section] 24 does not apply to extinguish the claim, and part or all of the claim subsists as a possible basis for a second action by the plaintiff against the defendant:
>
> · · ·
>
> (c) The plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in

---

**10.** Peabody does not argue on appeal that to impose punitive damages the findings required under MAI 10.01 are also required under Kentucky law.

the first action because of the limitations on the subject matter jurisdiction of the courts or restrictions on their authority to entertain multiple theories or demands for multiple remedies or forms of relief in a single action, and the plaintiff desires in the second action to rely on that theory or to seek that remedy or form of relief;

The lease requires the parties, as a condition precedent to bringing a legal action, to have questions arising under the lease decided by arbitration. GRMT sought arbitration of its claims that Peabody breached the lease and committed fraud. GRMT sought punitive damages for Peabody's fraudulent conduct. The arbitration panel found that it lacked authority to consider GRMT's fraud claim and only decided GRMT's breach of the lease claim. Accordingly, plaintiffs were unable to litigate their fraud claims and seek punitive damages. Section 26 of the Restatement (Second) of Judgments applies here. Peabody's suggestion that section 26 should not apply because GRMT failed to take every step to avoid splitting its cause of action is without merit.

 "A judgment is not conclusive of any question that could not have been adjudicated in the case in which it was rendered." *Heins Implement Co. v. Missouri Highway & Transportation Comm'n*, 859 S.W.2d 681, 686 (Mo. banc 1993). If an issue is outside the jurisdiction of a court to determine, then the issue is not subject to the doctrine of res judicata. *Meier v. Thorpe*, 822 S.W.2d 556, 559 (Mo.App.1992); *see Wolf v. Gruntal & Co.*, 45 F.3d 524, 527–29 (1ˢᵗ Cir.1995); *Airtite v. DPR Limited Partnership*, 265 Ill. App.3d 214, 202 Ill.Dec. 595, 638 N.E.2d 241, 244 (1994). Here, the arbitrators found they lacked the authority to consider the fraud claim and res judicata does not apply. Peabody's eighth point is denied.

### I.

 In its ninth point, Peabody argues that the trial court erred in entering judgment against Peabody Holding on plaintiffs' claim regarding the taxes. Peabody contends that Peabody Holding breached no duty to plaintiffs and Peabody Holding never had any royalty obligation to plaintiffs or performed any task related to the calculation or payment of royalties. Peabody further contends that Peabody Holding's only "relationship" to the relevant events is that it is the parent corporation for Peabody Coal and Peabody Development. Peabody cites to cases holding that, with certain exceptions, a parent corporation is not liable for the acts of its subsidiary corporation. *Mitchell v. K.C. Stadium Concessions, Inc.*, 865 S.W.2d 779, 784 (Mo.App. W.D.1993)(discussing piercing the corporate veil exception); *Sedalia Mercantile Bank & Trust Co. v. Loges Farms, Inc.*, 740 S.W.2d 188, 202 (Mo.App.1987)(discussing agency exception); *Liberty Financial Management Corp. v. Beneficial Data Processing Corp.*, 670 S.W.2d 40, 52 (Mo.App.1984)(discussing piercing the corporate veil exception).

The issue is whether there is sufficient evidence to find Peabody Holding liable for fraud based on the actions of its employees. Thirty Seven Am.Jur.2d *Fraud and Deceit* Section 305 (1968) provides that "[o]ne who participates in a fraud is of course guilty of fraud, and one who, with knowledge of the facts, assists another in the perpetration of a fraud is equally guilty." *See Hobbs v. Boatright*, 195 Mo. 693, 93 S.W. 934, 939–40 (1906). Similarly, 37 C.J.S. *Fraud* Section 83 (1997) states that a party is not liable for a fraudulent misrepresentation unless the party made the representation, authorized another to make it, or "in some way participated therein."

The evidence regarding the proposed accounting change is relevant to this issue. A.R. Rosavage, Chief Financial Officer for Peabody Holding, asked W.H. Carson, Peabody Holding's Vice President of Accounting, to evaluate an accounting change where the taxes would be treated as gross revenue. Peabody Coal employees told

Carson that for calculating royalties the taxes were not included in the sales price for the leases that were silent as to the taxes, and expressed concern regarding claims by lessors for the underpayment of royalties. In a memorandum, Carson told Rosavage that certain coal leases were "silent" as to whether royalties should include or exclude the taxes and "our legal position could be somewhat weakened if we used the gross method in our accounting while recording and paying the royalties on the net basis." The evidence shows that Peabody Holding employees recognized or were informed that the proposed change would increase the likelihood that lessors would discover the taxes were being deducted and therefore increase the likelihood of claims for the underpayment of royalties. Carson decided not to make the accounting change. This evidence is sufficient to support a finding that Peabody Holding assisted and participated in the perpetration of the fraud. Peabody's ninth point is denied.

## V.

In the final seven points, not previously addressed, Peabody raises issues contending it is entitled to a new trial. No error of law appears and an opinion on these points would have no precedential value. Peabody's remaining seven points are denied. Rule 84.16(b).

The judgment is affirmed.

JAMES A. PUDLOWSKI, P.J., and CLIFFORD H. AHRENS, J., Concur.